PER CURIAM.
 

 Timothy Lee Hurst appeals from an order denying his motion filed under Florida Rule of Criminal Procedure 3.851 seeking to vacate his judgment of conviction of first-degree murder and sentence of death.
 
 [1]
 
 For the reasons explained below, we vacate the sentence of death and remand for a new penalty phase proceeding. We affirm the circuit court’s order denying relief as to the remainder of Hurst’s claims.
 

 I. BACKGROUND
 

 Hurst, who was nineteen at the time of the murder, was convicted of the May 2, 1998, first-degree murder of Cynthia Harrison in Escambia County. His conviction and sentence of death were affirmed on direct appeal in
 
 Hurst v. State,
 
 819 So.2d 689 (Fla.),
 
 cert. denied,
 
 537 U.S. 977, 123 S.Ct. 438, 154 L.Ed.2d 336 (2002).
 
 [2]
 
 Hurst now appeals the denial of his initial and amended rule 3.851 motions after an evi-dentiary hearing was held on most of his claims. First, the relevant circumstances of the crime and trial are set forth.
 

 A. Facts of the Murder
 

 On May 2, 1998, Hurst was employed at a Popeye’s restaurant on Nine Mile Road
 
 *985
 
 in Escambia County, where Cynthia Harrison was employed as an assistant manager. Hurst and Harrison were both scheduled to arrive at work that day at 8 a.m., in order to prepare for the 10:30 a.m. opening. Harrison arrived first, somewhere between 7:15 and 7:30 a.m. That same morning, Carl Hess arrived for work at a nearby Wendy’s restaurant at 7 a.m. He testified that sometime between 7 and 8:30 a.m., as he was working in the Wendy’s parking lot, he saw a man who was about six feet tall and weighing between 280 and 300 pounds, dressed in a Popeye’s uniform, arrive at Popeye’s and bang on the door and window. Eventually, a woman came to the door and let him in. Hess picked Hurst from a photographic lineup as the man he saw banging on the door and window and, at trial, he identified Hurst as the man he saw that morning. Hess said he had seen Hurst working at Popeye’s before and that Hurst had filed an application for employment at Wendy’s, but had not been hired.
 

 That same May 2 morning, a Popeye’s delivery truck was making rounds to the restaurants. Janet Pugh, who worked at another Popeye’s, telephoned Harrison at 7:55 a.m. to tell her that the delivery truck should be expected soon at her restaurant. Pugh spoke to Harrison for four or five minutes and did not detect anything wrong or hear anyone in the background. Shortly after 8 a.m., Popeye’s employee Anthony Brown arrived, only to find the door locked, although he saw Harrison’s car in the parking lot. The delivery truck arrived about five minutes after Brown, and the driver and Brown waited outside the restaurant until Tonya Crenshaw, another Popeye’s assistant manager, arrived. Neither Brown nor the delivery driver saw Hurst or his car.
 

 When Tonya Crenshaw arrived at about 10:30 a.m. and unlocked the door, she and the delivery driver entered and found the safe open and the previous day’s receipts and $375 in small bills and change missing. Harrison’s body was discovered inside the freezer with her hands bound behind her back with electrical tape and with tape over her mouth. Similar tape was later found in the trunk of Hurst’s car. A significant amount of the victim’s blood was present although it appeared from water on the floor that someone had attempted to clean up the scene.
 

 Harrison suffered at least sixty slash and stab wounds to her face, neck, back, torso, and arms. Dr. Michael Berkland testified that several of the wounds had the potential to be fatal and that Harrison probably survived no more than fifteen minutes. A box cutter with Harrison’s blood on it was found near her body, and Dr. Berkland testified that her wounds were consistent with the use of a box cutter. It was not the type of box cutter that was used at Popeye’s, but was similar to a box cutter that Hurst had been seen with several days earlier. Dr. Berkland testified that the likely “window” for the time of death was between 7:55 a.m. and 8:15 am.
 

 Hurst’s friend, Michael Williams, testified that Hurst had previously talked about robbing Popeye’s and had subsequently admitted that he killed Harrison with a box cutter after they had an argument and because he “did not want the woman to see his face.” Another friend, Lee (“Lee-Lee”) Smith, testified that on the night before the murder, Hurst said he was going to rob Popeye’s. On the morning of the murder, Hurst arrived at Smith’s house and, according to Smith, admitted that he had killed Harrison and put her in the freezer. Hurst brought with him a container of money and instructed Smith to keep it for him. Smith said he washed Hurst’s bloody pants and
 
 *986
 
 threw away Hurst’s socks and shoes, along with some other items. Later that same morning, Smith and Hurst went to Wal-Mart where Hurst bought a new pair of shoes. They also went to a pawn shop near Wal-Mart where Hurst saw some rings he wanted to buy. After retrieving some of the stolen money, he returned to the pawn shop and bought three rings for $300. An employee of the pawn shop picked Hurst out of a photographic lineup as the man who had purchased the rings, and the rings were recovered from Hurst.
 

 Smith’s parents, who were out of town on the day of the murder, discovered the container of money in Smith’s room when they returned on May 3. They contacted law enforcement, and responding deputies found a coin purse containing Harrison’s driver’s license in a garbage can located in Smith’s yard. They also found a bank bag marked “Popeye’s”; a deposit slip with three of Hurst’s fingerprints; a bloodstained sock with DNA typing consistent with Harrison; and a sheet of notebook paper marked “Lee Smith, language lab” on one side and with $2,226 and $1,751.54 written on the other side. One of the numbers written there matched a number on the deposit slip. Smith’s father also gave the police a pair of size fourteen shoes, which had been found in the same trash can. The shoes were several sizes larger than those worn by Lee-Lee Smith and appeared to have blood stains on them. Florida Department of Law Enforcement crime lab analyst Jack Remus testified that the shoes exhibited indications of blood but that attempts at DNA testing were unsuccessful.
 

 In a tape recording of Hurst’s interview with the police several days after the murder, Hurst said he had been on his way to work on May 2 when his car broke down. Hurst said he telephoned Harrison to say he would not be in and that during the conversation she sounded scared. He testified that he then went to Smith’s house, changed out of his work clothes, and went to the pawn shop where he bought necklaces for friends. In the taped interview, he .did not mention buying the three rings at the pawn shop or buying new shoes at Wal-Mart that morning, although the investigative reports did indicate that the Sheriffs investigators knew Hurst had gone to Wal-Mart and purchased new shoes. The jury found Hurst guilty of first-degree murder, and the case proceeded to the penalty phase. Because this appeal involves a significant penalty phase claim requiring remand for a new penalty phase proceeding, a brief summary of the penalty phase evidence is set forth.
 

 B. Penalty Phase and Sentencing
 

 In the penalty phase, the State presented only the victim’s sister, Trida Poleto, who testified that Cynthia Harrison was twenty-eight years old when she died and was much loved and missed by her family and her husband. In mitigation, the defense presented Hurst’s mother, Bertha Bradley, who testified that he did not have a bad temper but was a happy child who never had trouble with the law. She testified that Hurst was helpful around the house, attended church regularly, and made average grades in school, although he was slow and could not learn like other children. According to Mrs. Bradley, Hurst had an emotional age of a child about ten or eleven years old, was a follower and not a leader, and would do whatever his friend Lee-Lee Smith told him to do. She related that Hurst was employed at Popeye’s and worked hard to reach his goal of being able to buy a ear. To her knowledge, he never had any psychiatric problems and had not been treated by a psychiatrist or psychologist.
 

 The defense also presented Hurst’s sister, Sequester Katina Hurst, who testified
 
 *987
 
 that she and Hurst grew up in a house where the children did a lot of things together and played a lot of games. Because their father worked two jobs and their mother also worked, Hurst had to take care of the younger children and care for the house. She never saw Hurst lose his temper or get into fights and said he was a happy person who liked to joke around. She agreed Hurst was slower than others his age but said that he tried really hard in everything he did. The last mitigation witness, Hurst’s father, Timothy Bradley, testified that Hurst was a Christian who participated in Bible studies and helped out at church. He testified that Hurst was a good boy who helped around the neighborhood and did not have a violent streak.
 

 The trial court instructed the jury on two aggravating circumstances — commission of the murder during a robbery and that the murder was especially heinous, atrocious or cruel (HAC) — -and on a number of mitigating circumstances for consideration by the jury. The jury voted eleven to one to recommend death. The trial court sentenced Hurst to death and found not two (the number on which the jury was instructed), but three aggravating circumstances: (1) the murder was committed by a person engaged in the commission of a robbery (“great weight”); (2) the murder was especially heinous, atrocious, and cruel (HAC) (“great weight”); and (3) the murder was committed primarily for the purpose of avoiding or preventing a lawful arrest (“great weight”).
 

 The trial court found the following mitigating factors: (1) Hurst’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (“little weight”); (2) he exhibited good conduct through every phase of the trial (“little weight”); (3) he had no prior criminal history (“moderate weight”); (4) he made contributions to the community in assisting his church and neighbors (“little weight”); (5) he attended church regularly and participated in weekly Bible study (“little weight”); (6) he assisted his mother and father around the home and took care of and protected his younger siblings (“moderate weight”); and (7) Hurst’s age at the time of the murder was eighteen (“very little weight”).
 

 On direct appeal, Hurst challenged the finding of the avoid arrest aggravator as not supported by competent, substantial evidence, and this Court agreed. We concluded, however, that the error in finding the aggravator was harmless in light of the other two strong aggravators “weighed against relatively weak mitigation.”
 
 Hurst,
 
 819 So.2d at 696. We also concluded that the trial court erred in essentially rejecting the “good family background” mitigator even though it was established by uncontroverted testimony. That error was also found to be harmless, however, because the trial court did consider and give weight to other family and community mitigation and because of the severity of the aggravators.
 
 Id.
 
 at 699. Finally, in holding the death sentence to be proportionate, we noted the “relatively little mitigation.”
 
 Hurst,
 
 819 So.2d at 702.
 

 Hurst has raised several guilt phase posteonviction claims and one penalty phase claim. He also contends that the cumulative effect of errors in the guilt and penalty phases deprived him of a fair trial. We turn first to the guilt phase claims.
 

 II. GUILT PHASE CLAIMS AFTER AN EVIDENTIARY HEARING
 

 A.
 
 Brady
 
 and
 
 Giglio
 
 Claims
 

 Hurst first contends that the State withheld favorable, material evidence in violation of
 
 Brady v. Maryland,
 
 373
 
 *988
 
 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963),
 
 [3]
 
 in regard to State’s witnesses David Kladitis, Anthony Williams, and Lee-Lee Smith. We disagree and affirm the trial court’s denial of postconviction relief on these claims. A
 
 Brady
 
 violation occurs “when the government fails to disclose evidence materially favorable to the accused.”
 
 Youngblood v. West Virginia,
 
 547 U.S. 867, 869, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006);
 
 see also Riechmann v. State,
 
 966 So.2d 298, 307 (Fla.2007) (citing
 
 Mordenti v. State,
 
 894 So.2d 161, 168 (Fla.2004)). The government’s obligation to disclose materially favorable evidence extends to both exculpatory and impeachment evidence,
 
 United States v. Bagley,
 
 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and to “evidence that is ‘known only to police investigators and not to the prosecutor.’ ”
 
 Youngblood,
 
 547 U.S. at 870, 126 S.Ct. 2188 (quoting
 
 Kyles v. Whitley,
 
 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).
 

 Standard of Review for a
 
 Brady
 
 Claim
 

 In order to demonstrate a
 
 Brady
 
 violation, the defendant has the burden to show (1) that favorable evidence, either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.
 
 Strickler v. Greene,
 
 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999);
 
 see also Way v. State,
 
 760 So.2d 903, 910 (Fla.2000). In order to meet the materiality prong of
 
 Brady,
 
 the defendant must demonstrate “a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.”
 
 Youngblood,
 
 547 U.S. at 870, 126 S.Ct. 2188 (quoting
 
 Strickler,
 
 527 U.S. at 280, 119 S.Ct. 1936). “[A] ‘showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant’s acquittal.’ ”
 
 Youngblood,
 
 547 U.S. at 870, 126 S.Ct. 2188 (quoting
 
 Kyles,
 
 514 U.S. at 434, 115 S.Ct. 1555). A reasonable probability of a different result “is a probability sufficient to undermine confidence in the outcome.”
 
 Strickland v. Washington,
 
 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984);
 
 see also Strickler,
 
 527 U.S. at 290, 119 S.Ct. 1936.
 

 Postconviction
 
 Brady
 
 claims present mixed questions of law and fact. Where, as here, the trial court has conducted an evidentiary hearing, we will defer to the factual findings of the trial court that are supported by competent, substantial evidence, but will review the application of the law to the facts de novo.
 
 Sochor v. State,
 
 883 So.2d 766, 785 (Fla.2004);
 
 see also Lowe v. State,
 
 2 So.3d 21, 29 (Fla.2008). Moreover, “this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.”
 
 Lowe,
 
 2 So.3d at 30 (quoting
 
 Blanco v. State,
 
 702 So.2d 1250, 1252 (Fla.1997)). It is within this framework that we first discuss the
 
 Brady
 
 claims raised by Hurst.
 

 
 *989
 
 1.
 
 Brady
 
 Claim Regarding the Testimony of David Kladitis and Lee-Lee Smith
 

 Hurst contends that the State failed to disclose favorable, material evidence that State’s witness David Kladitis saw several young black men in the parking lot of the Popeye’s at around 7 a.m. on the morning of the murder. At the jury trial, Kladitis testified only that early on the day of the murder, while at the Barnes feed store near Popeye’s, he saw Cynthia Harrison drive by in her car about 7:15 or 7:20 a.m., and that a large blue car, driven by a black man, was driving along behind her. He identified the blue ear as matching Hurst’s blue car. At the evidentiary hearing, Kladitis testified that he was deposed in the case but was never asked about any other observations he made concerning the Popeye’s parking lot on the morning of the murder, even though he did report those observations to the Sheriffs Office investigators. That additional information was never disclosed to the defense.
 

 Kladitis testified at the evidentiary hearing that on the morning of the murder, he left the Barnes feed store to get a take-out breakfast and then returned to a parking lot near the Popeye’s to eat. He saw a white automobile occupied by a couple of young black men drive into the Popeye’s parking lot with the windows down and “music playing real loud.” Another automobile then drove up with several black men in it, also playing loud music. Around 7 a.m., Kladitis moved his car because the music was too loud. Hurst contends that this evidence was favorable because these individuals could be viewed as suspects in the murder, consistent with his theory of defense at trial that some other young black men committed the murder.
 

 The postconviction court concluded that the additional information Kladitis gave to investigators “does not undermine confidence in the verdict,” noting that Harrison was not killed until after 8 a.m., while the men Kladitis saw in the parking lot were there much earlier and were playing loud music. The court concluded that the additional evidence, when considered with the totality of the other evidence in the case, does not demonstrate a
 
 Brady
 
 violation. We agree.
 

 “[T]he prosecution is not required to provide the defendant all information regarding its investigatory work on a particular case regardless of its relevancy or materiality.”
 
 Overton v. State,
 
 976 So.2d 536, 562 (Fla.2007) (citing
 
 Carroll v. State,
 
 815 So.2d 601, 620 (Fla.2002)).
 
 Compare Rogers v. State,
 
 782 So.2d 373, 384 (Fla.2001) (finding
 
 Brady
 
 violation for nondisclosure of police reports containing a tape revealing favorable, relevant evidence of coaching by the prosecutor and conflicting accounts of a witness’s testimony) w
 
 ith Wright v. State,
 
 857 So.2d 861, 870 (Fla.2003) (rejecting claim that “information contained in police files concerning other possible suspects and other criminal activity in the same neighborhood” was
 
 Brady
 
 material). In applying the
 
 Brady
 
 criteria, “the evidence must be considered in the context of the entire record.”
 
 Floyd v. State,
 
 902 So.2d 775, 779 (Fla.2005). “It is the net effect of the evidence that must be assessed.”
 
 Way,
 
 760 So.2d at 913 (quoting
 
 Jones v. State,
 
 709 So.2d 512, 521 (Fla.1998)).
 

 We conclude that the additional information Kladitis provided about the men he saw in the parking lot more than an hour before the murder is not exculpatory or impeaching and is of questionable relevance. The additional evidence that Kladi-tis could have offered did not tie the unidentified men to the Popeye’s crimes in any relevant manner, so no
 
 Brady
 
 violation occurred. ■ Even if the State should have disclosed these additional observa
 
 *990
 
 tions made by Kladitis, any error in the State’s failure to disclose this evidence does not undermine our confidence in the verdict when viewed in light of the totality of all the evidence in the case. Thus, the trial court’s denial of relief on the
 
 Brady
 
 claim relating to witness Kladitis is affirmed.
 

 Hurst also contends that the State committed a
 
 Brady
 
 violation in failing to disclose the fact that Lee-Lee Smith would be charged with a crime in connection with the case. Smith was the State’s main witness against Hurst and testified at trial that Hurst came to his home around 8:30 a.m. on the morning of the murder and admitted that he had killed Harrison. Smith hid the money Hurst brought with him, washed Hurst’s bloody pants, and threw away Hurst’s tennis shoes and socks. At the time of trial, Smith had not been charged with any crimes in connection with the Popeye’s robbery and murder. After the trial concluded, Smith was charged as a juvenile — as an accessory after the fact — and was subsequently convicted of that charge. Hurst argues on appeal that if the jury had known Smith would be charged in connection with the crime, there would have been no basis for the State’s argument below that Smith would do anything that Hurst wanted. Hurst also contends that Smith’s credibility before the jury would have been impeached if the jury had known he would be charged. Based on the testimony at the evidentiary hearing, we agree with the trial court that no
 
 Brady
 
 violation occurred.
 

 When Smith testified at the evidentiary hearing, he was uncertain about when he learned he would be charged in the case. The prosecutor, David Rimmer, also testified and denied telling Smith or his mother before trial that Smith would be charged. The prosecutor also denied that he had a plan to charge Smith and said that he did not decide to do so until after the trial was over. The postconviction court denied the claim, finding that the credible evidence demonstrated that the prosecutor did not tell Smith or Smith’s mother before trial that he would be charged. The postcon-viction court found Smith’s testimony uncertain and Rimmer’s testimony credible, and we will not substitute our judgment for that of the trial court on this question of fact, the credibility of the witnesses, or the weight given to the evidence by the trial court.
 
 See Lowe,
 
 2 So.3d at 30. Thus, relief is denied on this claim.
 
 [4]
 

 2.
 
 Brady
 
 and
 
 Giglio
 
 Claims Regarding the Testimony of Anthony Williams
 

 Hurst next contends that the State committed a
 
 Brady
 
 violation in regard to the trial testimony of Anthony Williams by not disclosing that he was promised leniency by the prosecutor in exchange for his testimony at trial, now alleged to be false, that Hurst confessed to Harrison’s murder. Hurst further argues that a
 
 Giglio
 
 violation occurred in regard to Williams’ testimony when the prosecutor argued falsely to the jury that there were no promises of leniency. As we will explain, this claim is also without merit.
 

 Standard of Review for
 
 Giglio
 
 Claims
 

 Under
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104
 
 *991
 
 (1972), the prosecutor is prohibited from knowingly presenting false testimony against the defendant. In order to demonstrate a
 
 Giglio
 
 violation, “a defendant must show that (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material.”
 
 Tompkins v. State,
 
 994 So.2d 1072, 1091 (Fla.2008) (quoting
 
 Rhodes v. State,
 
 986 So.2d 501, 508-09 (Fla.2008)). Once the first two prongs are established by the defendant, the false evidence is deemed material if there is any reasonable possibility that it could have affected the jury’s verdict.
 
 Tompkins,
 
 994 So.2d at 1091. The State then “has the burden to prove that the false testimony was not material by demonstrating it was harmless beyond a reasonable doubt.”
 
 Id.
 
 (quoting
 
 Rhodes,
 
 986 So.2d at 509). “The
 
 DiGuilio
 
 harmless error test requires the State to prove ‘that there is no reasonable possibility that the error contributed to the conviction.’ ”
 
 Guzman v. State,
 
 941 So.2d 1045, 1050 (Fla.2006) (quoting
 
 State v. DiGuilio,
 
 491 So.2d 1129, 1138 (Fla.1986)). A
 
 Giglio
 
 claim presents mixed questions of law and fact, and this Court will defer to the factual findings of the circuit court that are supported by competent, substantial evidence and review the application of the law to the facts de novo.
 
 See Lynch v. State,
 
 2 So.3d 47, 83 (Fla.2008) (citing
 
 Sochor,
 
 883 So.2d at 785).
 

 At the jury trial, Anthony Williams testified that he and Hurst were cellmates in the Escambia County jail, where they discussed the Popeye’s murder. Williams testified that Hurst told him “[t]hat he had participated in it.” At the evidentiary hearing, Williams, currently serving a life sentence for armed robbery, testified that he committed perjury at Hurst’s trial when he testified that Hurst told him he participated in the crime. According to Williams, on the day of trial he told the prosecutor that he did not want to testify and the prosecutor said “that I knew to do the right thing and he would take care of me in the long run.” Williams interpreted this to mean if he testified, he would get some leniency, but as it turned out he did not.
 

 The prosecutor, David Rimmer, testified at the evidentiary hearing that he never talked to Anthony Williams about his cases and that he “never made any promises to him about his pending cases.” Rimmer said Williams’ main concern was being kept apart from Hurst and “I told him I could take care of that: I could keep him separated from Timothy Hurst and any other inmates that he felt might try to harass him.” Rimmer explained, “I never give them any indication that I’m going to do anything. I always, in fact, cut them off and tell them to start with, I can’t make you any promises.... And the only promise I can make is that I’ll keep them separated from the other inmates, from the defendant.”
 

 After hearing testimony from Williams and the prosecutor, the postconviction court denied relief on the claims. First, the postconviction court found that Williams’ evidentiary hearing testimony recanting his trial testimony was not credible and noted that Williams had waited over two years to report that Hurst had not confessed. The court also found that the State did not fail to disclose any promises made to Williams in violation of
 
 Brady
 
 because the court found, based on the testimony of prosecutor Rimmer, that no promises were made. We will not second-guess the postconviction court on this issue of credibility of the witnesses and agree that no
 
 Brady
 
 violation has been shown.
 

 The postconviction court also concluded that a
 
 Giglio
 
 violation had not been proven. Hurst contends that the prosecutor
 
 *992
 
 argued falsely when he said during closing argument:
 

 There’s been no testimony that the inmates want reductions in their sentences. There’s been no testimony that that’s why they came forward; none whatsoever.... There’s been no testimony that these inmates have tried to get a reduction in their sentence.
 

 Based on the testimony presented and found credible at the evidentiary hearing, the trial court correctly concluded that no promises of leniency had been made to Williams. Thus, this
 
 Giglio
 
 claim that the prosecutor argued falsely is refuted by competent, substantial evidence, and we will not substitute our judgment for that of the circuit court on these questions of fact and determination of credibility.
 

 Because Hurst has not demonstrated a
 
 Brady
 
 violation or a
 
 Giglio
 
 violation in relation to witnesses David Kladitis, Lee-Lee Smith, or Anthony Williams, relief is denied on this claim.
 

 B. Newly Discovered Evidence Claims
 

 Hurst next contends (1) that Anthony Williams’ recantation of his trial testimony that Hurst confessed and Williams’ admission to committing perjury at Hurst’s tidal constitute newly discovered evidence requiring a new trial; (2) that Lee-Lee Smith’s post-trial indictment and conviction as an accessory after the fact in connection with the Popeye’s murder is newly discovered evidence that would have significantly impeached his harmful trial testimony, thus requiring a new trial or at least a new sentencing; and (3) that the admission by a trial witness, Carl Hess, that he never interviewed Hurst, as he testified at trial, is newly discovered evidence that requires a new trial.
 

 As explained below, we find that Hurst failed to demonstrate that a new trial is required based on any of his newly discovered evidence claims. First, we set forth the standard of review for claims of newly discovered evidence.
 

 Standard of Review for Newly Discovered Evidence
 

 To obtain a new trial based on newly discovered evidence, a defendant must establish two things: First, the defendant must establish that the evidence was not known by the trial court, the party, or counsel at the time of trial and that the defendant or defense counsel could not have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.
 
 See Jones v. State,
 
 709 So.2d 512, 521 (Fla.1998). “Newly discovered evidence satisfies the second prong of this test if it ‘weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability.’ ”
 
 Heath v. State,
 
 3 So.3d 1017, 1023-24 (Fla.2009) (quoting
 
 Jones,
 
 709 So.2d at 526).
 

 In determining whether newly discovered evidence requires a new trial, the trial court must “ ‘consider all newly discovered evidence which would be admissible,’ and must ‘evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial.’ ”
 
 Heath,
 
 3 So.3d at 1025 (quoting
 
 Jones v. State,
 
 591 So.2d 911, 916 (Fla.1991)). This determination includes consideration of evidence that goes to the merits of the case as well as impeachment evidence. The trial court should also determine whether this evidence is cumulative to other evidence in the case, whether the evidence is material and relevant, and whether there are any inconsistencies in the newly discovered evidence.
 
 Jones,
 
 709 So.2d at 521. “[A]bsent an abuse of discretion, a trial court’s decision on a motion based on newly discovered evidence [including a witness’s newly recanted testi
 
 *993
 
 mony] will not be overturned on appeal.”
 
 Lowe,
 
 2 So.3d at 39 (brackets in original) (quoting
 
 Mills v. State,
 
 786 So.2d 547, 549 (Fla.2001)). In reviewing the circuit court’s decision as to a newly discovered evidence claim following an evidentiary hearing, where the court’s findings are supported by competent, substantial evidence, we will not substitute our judgment for that of the trial court on questions of fact, credibility of the witnesses, or the weight to be given to the evidence by the trial court.
 
 Jones,
 
 709 So.2d at 532.
 

 1. Newly Discovered Evidence Concerning Anthony Williams and Lee-Lee Smith
 

 Anthony Williams testified at the evidentiary hearing that he committed perjury at Hurst’s trial when he told the jury that Hurst confessed. However, as the postconviction court found and this Court has noted, “recanted testimony is ‘exceedingly unreliable,’ and if a trial court is not satisfied that the recanted testimony is true,
 
 it has a duty to deny the defendant a new tnal.” Heath,
 
 3 So.3d at 1024 (quoting
 
 Consalvo v. State,
 
 937 So.2d 555, 561 (Fla.2006)). The postconviction court found that Hurst did not satisfy the first prong of the newly discovered evidence test because it concluded Williams’ eviden-tiary hearing testimony was not credible. As to the second prong, the postconviction court further found that, even if Williams’ evidentiary hearing testimony was presented to the jury, it would not have changed the outcome of Hurst’s trial. We agree with these findings.
 

 In the instant case, the trial court simply did not believe Williams, who was a cellmate with Hurst in the Escambia County jail. Williams testified that he thought by testifying against Hurst at trial, he would receive some favorable sentencing treatment in his own pending case. As it turned out, Williams received a life sentence. Even if the jury never heard Anthony Williams’ testimony that Hurst confessed, or if it heard Anthony Williams’ recantation of that testimony, other evidence in the case must be considered when determining if a new trial is required. Other evidence included the fact that Smith testified that Hurst confessed to the murder and gave him a container with the money from the robbery. The bag containing the stolen money also contained a Popeye’s bank deposit slip with Hurst’s fingerprints. Hurst’s supervisor testified that Hurst would have had no occasion to place his fingerprint on the deposit slips. Hess identified Hurst as the man he saw entering Popeye’s that morning.
 

 In addition, Michael Williams (as distinguished from Anthony Williams) testified at trial that he had known Hurst for a long time and that Hurst told him about the murder.
 
 [5]
 
 He testified that Hurst said he had gotten into an argument with a woman and hit her, cut her with a box cutter, and put her in the freezer because “he didn’t want the woman to see his face.” Michael Williams also testified that he had heard Hurst and Smith talking about robbing Popeye’s on several occasions. Hurst bought new tennis shoes on the morning of the murder and other tennis shoes consistent with Hurst’s large size were found in the trash at Smith’s house bearing indications of blood. Finally, tape similar to that which bound Cynthia Harrison was found in Hurst’s trunk. In “considering] all newly discovered evidence which would be admissible” and “evaluating] the ‘weight of both the newly, discovered evidence and the evidence which was introduced at the trial,’ ”
 
 Jones,
 
 709 So.2d at
 
 *994
 
 521 (quoting
 
 Jones,
 
 591 So.2d at 916), we conclude that the case against Hurst would not have been weakened to such an extent that he probably would have been acquitted, even if the jury heard the recantation of Anthony Williams’ testimony.
 

 As to the claim of newly discovered evidence concerning Lee-Lee Smith, Hurst contends that the fact that Smith was charged and convicted after Hurst’s trial as an accessory after the fact in connection with the Popeye’s crimes is newly discovered evidence that probably would have resulted in either an acquittal or a life sentence.
 
 [6]
 
 Smith’s trial testimony gave a detailed account of Hurst’s confession to the murder and production of the stolen money. The jury heard how Smith, age fifteen at the time, assisted Hurst in hiding the money, washing Hurst’s bloody pants, and throwing away Hurst’s bloody shoes and sock. Hurst contends that if the jury had known Smith was a codefen-dant in the case and was guilty of being an accessory after the fact, it would have impeached his credibility and would have dispelled the State’s suggestion that Smith was just a dupe of Hurst.
 

 The postconviction court denied relief on this claim, concluding that Hurst had not demonstrated the result of the trial would probably have been different. The court noted that had the jury known that Smith was a codefendant in the case and was guilty as an accessory after the fact, it is likely the jury would have given Smith’s trial testimony even more credibility. In fact, Smith’s testimony clearly apprised the jury of the very same actions which underlay his later conviction as accessory, so the jury already had that information when assessing his credibility. Moreover, other evidence in the case tied Hurst directly to the murder and robbery and would not have been rebutted or diminished in any way by the jury learning that Smith was guilty of being an accessory after the fact. Because the new evidence would probably not produce an acquittal on retrial, the postconviction order denying the newly discovered evidence claim relating to Smith is affirmed.
 

 2. Newly Discovered Evidence Concerning Carl Hess
 

 Carl Hess was the only eyewitness directly placing Hurst at the scene of the crime. Hess testified at trial, on direct examination, that he worked at the Wendy’s restaurant near Popeye’s and was cleaning up the parking lot on the morning of the murder when he saw Cynthia Harrison arrive for work. He testified that he later saw a large black man wearing a Popeye’s uniform arrive at Popeye’s and bang on the window and door, and was let into the restaurant. Hess identified Hurst in court, and had previously picked him out of a photo lineup, as the man he saw that morning. Hess said he knew Hurst from having seen him “coming and going” at Popeye’s and because Hurst had “filled an application out at the Wendy’s.”
 

 It was not until cross-examination that Hess testified that he had interviewed Hurst. However, Hess also admitted on cross-examination that he was not an assistant manager as he had stated, having failed out of the assistant manager program, and further admitted that he did not have authority to interview applicants. His supervisor, Sun Nguyen, testified at trial that Hess did not interview job applicants or make hiring decisions. At the evidentiary hearing, Hess admitted that he lied at trial when he testified that he had
 
 *995
 
 interviewed Hurst and several other unsuccessful applicants for employment at Wendy’s.
 

 The postconviction court denied the claim, concluding that the fact that Hess never interviewed Hurst was not “newly discovered” because his cross-examination at trial and the testimony of his supervisor, Sun Nguyen, made clear to the jury that Hess could not have interviewed Hurst. However, Hess never admitted his lie to the jury and Hurst now argues that the admission is, therefore, newly discovered. He further contends that “[h]ad the jury known that Mr. Hess had no basis upon which to recognize and thus identify Mr. Hurst from the photo array, it would have rejected his testimony completely.” Assuming that the admission of Hess’s misrepresentation is newly discovered evidence, we conclude that the evidence would not probably produce an acquittal on retrial.
 

 First, Hess’s admission that he lied about interviewing Hurst does not establish that Hess had no other basis on which to identify Hurst that morning. Hess worked at Wendy’s and spent substantial time working in the parking lot. He testified that he saw Hurst from time to time coming and going at Popeye’s. Second, even when provided with substantial impeaching evidence concerning Hess’s testimony, the jury still found Hurst guilty. Thus, we conclude that Hess’s admission, even if newly discovered, does not meet the second prong of
 
 Jones
 
 because it does not weaken the case against Hurst such that it would probably produce an acquittal on retrial.
 
 See Jones,
 
 709 So.2d at 521, 526. Moreover, ample other evidence and testimony established Hurst’s guilt — discarded shoes and a sock bearing the victim’s blood; money concealed by Smith at Hurst’s request; a Popeye’s deposit slip with Hurst’s fingerprints; Hurst’s purchase of new tennis shoes at Wal-Mart the morning of the murder; Hurst’s confession to Michael Williams; and Hurst’s confession to Lee-Lee Smith. Because Hurst has not established that evidence of Carl Hess’s misrepresentation about interviewing Hurst would probably produce an acquittal on retrial, we deny relief on this claim.
 

 C. Ineffective Assistance of Counsel in the Guilt Phase
 

 The postconviction court held an eviden-tiary hearing on Hurst’s claim that in two instances trial counsel was ineffective, and Hurst appeals the denial of relief on those claims. He first contends that trial counsel was ineffective in failing to properly investigate and present evidence, based on information in police reports, that an individual named Andrew Salter was in the vicinity of the Popeye’s parking lot on the morning of the murder, between 5:30 and 7:30 a.m., and did not see Hurst in the area. Second, Hurst contends that counsel was ineffective in failing to rebut the prosecutor’s implication that Hurst did not tell the police that he went to Wal-Mart the morning of the murder. For the reasons set forth below, we agree with the postconviction court that relief is not warranted on these claims.
 

 Standard of Review for Ineffective Assistance of Counsel Claims
 

 Following the United States Supreme Court’s decision in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
 

 First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency
 
 *996
 
 shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
 

 Maxwell v. Wainwright,
 
 490 So.2d 927, 932 (Fla.1986) (citations omitted). Because both prongs of the
 
 Strickland
 
 test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court’s factual findings that are supported by competent, substantial evidence, but reviewing the circuit court’s legal conclusions de novo.
 
 See Sochor, 883
 
 So.2d at 771-72.
 

 “Judicial scrutiny of counsel’s performance must be highly deferential” and there is a strong presumption that trial counsel’s performance was not ineffective.
 
 Strickland,
 
 466 U.S. at 689, 104 S.Ct. 2052. “A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.”
 
 Id.
 
 The defendant carries the burden to “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ”
 
 Id.
 
 (quoting
 
 Michel v. Louisiana,
 
 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). “[Strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.”
 
 Occhicone v. State,
 
 768 So.2d 1037, 1048 (Fla.2000). The Court need not reach both
 
 Strickland
 
 prongs in every case. “[W]hen a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong.”
 
 Preston v. State,
 
 970 So.2d 789, 803 (Fla.2007) (quoting
 
 Whitfield v. State,
 
 923 So.2d 375, 384 (Fla.2005)).
 

 1. Ineffective Assistance of Counsel Claim Concerning Andrew Salter
 

 Within this framework, we turn first to the claim that counsel was ineffective for not identifying, locating, and presenting Andrew Salter to testify that he was in the vicinity for several hours that morning and did not see Hurst or his car. The postconviction court correctly found that trial counsel made a reasonable strategic decision not to pursue investigation of Salter and not to call him at trial, but to use another witness’s testimony about Salter’s presence on the scene to suggest that a suspicious person was in the area at the time of the crime. At the evidentiary hearing, Hurst’s trial counsel testified that he did know of the presence of an individual at the scene and initially attempted to identify that person. However, he explained:
 

 [ Fjrankly, it became, in my opinion, an advantage not to know who he was and to simply argue that he was a strange, suspicious black guy out there on a place, and I inferred that it was earlier than it really was, and it gave me an out, which supported my theory and argument in the case.... I didn’t want him identified to the jury. I’d rather him be the strange black guy out on a parking lot.
 

 Moreover, we agree with the postconviction court’s conclusion that failure to present Salter did not prejudice Hurst because Salter’s testimony was not exculpatory. When he testified at the evidentiary hearing, Salter could not say exactly when he arrived at the Wendy’s lot. Additionally,
 
 *997
 
 he was gone for an uncertain period of time both when he went home and returned and when he went to a nearby Winn-Dixie. He testified that he did not watch the Popeye’s parking lot carefully between 7:30 and 8:20 a.m., when the murder likely occurred. Salter testified that he saw no cars in the Popeye’s lot that morning — not even the victim’s car, which arrived sometime before 7:55 a.m,, which he would have seen if he had been carefully observing the lot. Thus, it appears that Salter’s testimony would have been of little assistance to Hurst, while the idea of a suspicious, unidentified black male in the vicinity that morning provided more benefit to the defense.
 

 The trial court’s finding that counsel made a reasonable, strategic decision not to locate and present Andrew Salter is supported by competent, substantial evidence in the record. Therefore, relief is denied on this claim.
 

 2. Ineffective Assistance of Counsel Claim Concerning Hurst’s Trip to Wal-Mart
 

 We turn next to the claim that trial counsel was ineffective for failing to rebut the prosecutor’s closing argument, in which he reminded the jury that Hurst never said in his taped statement to police that he went to Wal-Mart on the morning of the murder. The trial court correctly found that the record supported the truth of the prosecutor’s statement — Hurst did not tell the investigator on tape that he went to Wal-Mart. Defense counsel Arnold correctly noted that objecting to this true statement would have been unwarranted and that emphasizing to the jury that Hurst went to Wal-Mart — where he bought new tennis shoes on the morning of the murder — was essentially a double-edged sword. While it supported his sworn alibi notice, which included a reference to Hurst having gone to Wal-Mart to buy tennis shoes, it also supported the State’s contention that Hurst needed new shoes because his had been discarded due to blood from the murder.
 

 We agree with the postconviction court that counsel’s decision not to object to the prosecutor’s argument was a reasonable strategic decision. Because reasonable “strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct,”
 
 Occhicone,
 
 768 So.2d at 1048, relief is denied on this claim.
 

 III. SUMMARILY DENIED GUILT PHASE CLAIMS
 

 Standard of Review for Summary Denial of Rule 3.851 Claims
 

 Under Florida Rule of Criminal Procedure 3.851, an evidentiary hearing must be held on an initial motion for postconviction relief whenever the movant makes a facially sufficient claim that requires a factual determination.
 
 Gonzalez v. State,
 
 990 So.2d 1017, 1024 (Fla.2008). On an initial rule 3.851 motion, such as in the instant ease, to the extent there is any question whether the movant has made a facially sufficient claim requiring a factual determination, the court must presume that an evidentiary hearing is required.
 
 Booker v. State,
 
 969 So.2d 186, 195 (Fla.2007). The Court must accept the mov-ant’s factual allegations as true to the extent they are not refuted by the record.
 
 Gonzalez,
 
 990 So.2d at 1024. Because a postconviction court’s decision whether to grant an evidentiary hearing on a rule 3.851 motion is ultimately based on written materials before the court, its ruling is tantamount to a pure question of law, subject to de novo review.
 
 See Ventura v. State,
 
 2 So.3d 194, 197 (Fla.),
 
 cert. de
 
 
 *998
 

 nied,
 
 - U.S. -, 129 S.Ct. 2839, 174 L.Ed.2d 562 (2009).
 

 It is under this standard of review that Hurst’s supplemental claims will be analyzed. However, it should be remembered that the claims contained in Hurst’s supplemental motions are for the most part based on matters that were disclosed during the evidentiary hearing held on the majority of these claims and on follow-up depositions that Hurst was allowed to take for his supplemental claims. In that regard, these claims were not “summarily denied” without any evidentiary hearing, as that phrase is used in its traditional sense. The postconvietion court’s order stated the supplemental motions were denied without
 
 “another
 
 evidentiary hearing at this time.”
 

 After the evidentiary hearing was held in this case, Hurst filed four supplemental motions, which were all denied without an additional evidentiary hearing. Hurst’s supplemental claims arose out of the discovery of Investigator Donald Nesmith’s field notes at the evidentiary hearing; the prosecutor’s testimony at the evidentiary hearing referring to an ex parte conversation he had with trial Judge Tarbuck about whether Lee-Lee Smith would be charged; Carl Hess’s admission at the evidentiary hearing that he lied at trial about having interviewed Hurst for a job; and a new claim that trial witness Willie Griffin recanted a portion of his trial testimony.
 

 A. Investigator Donald Nesmith’s Field Notes
 

 The issue of Investigator Nes-mith’s notes will be discussed first. During the evidentiary hearing held on the initial motion for postconviction relief, Sheriffs Investigator Donald Nesmith testified and had with him at the hearing his field notes from the investigation. The notes were provided to the defense for review at that time, although they had previously been found exempt in the public records proceedings, and they were placed in the record. The Sheriffs office later waived any exemption relating to Nesmith’s notes, and Hurst was allowed to file a supplemental motion pertaining to information contained in the notes. Hurst filed a supplemental motion claiming that the State’s failure to provide the Nesmith notes to the defense prior to trial was a violation of
 
 Brady
 
 and that presentation of evidence in conflict with the notes constituted a
 
 Giglio
 
 violation. Although the postconviction court did not allow an additional hearing on the claim, the court did consider the Nesmith notes and supplemental depositions taken by Hurst’s counsel after the initial eviden-tiary hearing in reaching its decision to deny these claims.
 

 1. Nesmith’s Notes Regarding David Kladitis
 

 Hurst’s first supplemental motion alleged that Investigator Nesmith’s field notes reflect that David Kladitis told him about seeing three or four young black men in the Popeye’s parking lot prior to the murder. Hurst alleged that the notes supported Kladitis’s evidentiary hearing testimony and that Investigator Nesmith knew Kladitis had seen the men and concealed that information, thus supporting the
 
 Brady
 
 and
 
 Giglio
 
 claims pertaining to Kladitis that were alleged in Hurst’s initial motion. We agree with the postconviction court that an additional evidentiary hearing was not required. The observations made by Kladitis on the morning of the murder were fully explored in the eviden-tiary hearing at which he testified. Nes-mith’s field notes pertaining to the Kladitis interview were admitted into evidence at that hearing and were considered by the postconviction court in evaluation of the claims. Because we have concluded that the trial court did not err in denying the
 
 *999
 

 Brady
 
 and
 
 Giglio
 
 claims as they related to undisclosed statements of Kladitis, the existence of the notes supporting those statements does not alter that conclusion. Relief is therefore denied as to the
 
 Brady
 
 and
 
 Giglio
 
 claims based on the notes pertaining to David Kladitis.
 

 2. Nesmith’s Notes Regarding Lee-Lee Smith
 

 Hurst alleges a
 
 Brady
 
 violation in regard to the State’s failure to disclose Investigator Nesmith’s field notes of his interview with Lee-Lee Smith. Hurst also argues that a further evidentia-ry hearing should have been held relating to Nesmith’s notes, which reflected that Smith told Nesmith that “he” got rid of the murder weapon in a dumpster. Hurst contends that the “he” mentioned in the notes was Smith himself, thus showing Smith’s complicity in the murder; and that the notes demonstrate an inconsistency between Smith’s statement that the murder weapon was put in a dumpster and the fact that a bloody box cutter was found inside Popeye’s. After considering the content of the field notes, the trial court denied any further evidentiary hearing and denied the
 
 Brady
 
 claim.
 

 First, the court found that the “he” referred to in the notes was Hurst, not Smith. The field notes of the May 6,1998, interview with Smith, in the following format, relate Smith’s statements to Nesmith as follows:
 

 Tim said
 

 —He was going to kill the person
 

 —for the money
 

 —He said he was going to slice her throat
 

 —Said he was going to come up behind her
 

 —Said he was put [sic] her in freezer
 

 —Said he was going to tie her up then put her in freezer
 

 —Said he was going to take the money
 

 —Get rid of the weapon — in the dumpster behind Popeye’s
 

 • — Said he got rid of the weapon and mopped all the blood up
 

 We agree with the trial court that “this claim is without merit as the Court finds that ‘he’ obviously refers to Defendant and not Mr. Smith or some unnamed third party” and “such claim as pled does not amount to a
 
 Brady
 
 violation because it depends on speculation.” The notes concerning disposal of the murder weapon do not in any way indicate Smith was confessing to disposing of the murder weapon, and no
 
 Brady
 
 violation has been shown in the failure to disclose the notes for that reason.
 

 However, as to the State’s failure to disclose Smith’s statements that the murder weapon was disposed of in a dumpster, we conclude that the first two prongs of
 
 Brady
 
 have been established. To establish a
 
 Brady
 
 violation, the defendant must show (1) that favorable evidence, either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.
 
 See Strickler,
 
 527 U.S. at 281-82, 119 S.Ct. 1936. Smith’s statement to Nesmith that Hurst got rid of the murder weapon in a dumpster was inconsistent with the State’s evidence that the murder weapon was found inside Popeye’s. The basis for the postconviction court’s denial of relief was stated as follows:
 

 [ I]t is clear from trial counsel’s cross-examination [of Smith] that he was provided a transcript of a recorded statement that occurred contemporaneously with the interview session that spawned the notes in question. Trial counsel effectively utilized the information he had regarding the May 6, 1998, interview to impeach Mr. Smith. Therefore, due to
 
 *1000
 
 the extent of the impeachment described above, and in light of the entire record in this case, Defendant’s claim alleging the State improperly withheld Mr. Smith’s statement that Defendant “got rid of the murder weapon,” fails as a matter of law for lack of prejudice. An evidentiary hearing is not necessary because, even if the allegation is true and correct, the Court finds that it does not reasonably undermine confidence in the verdict, the third element of a legally sufficient
 
 Brady
 
 claim.
 

 However, this conclusion overlooks the fact that Smith was not cross-examined or impeached on anything concerning disposal of the murder weapon. Had the notes been disclosed and counsel been apprised of the fact that Smith told Nesmith that Hurst disposed of the murder weapon, Smith could have been cross-examined on the accuracy of his statement, and his statement could have been compared to the forensic testimony that the murder weapon, a box cutter, was found inside Popeye’s. Because disclosure of the notes would have also allowed counsel to explore this inconsistency by further investigation prior to trial, the field notes concerning Smith’s interview should have been disclosed.
 
 See
 
 Floyd, 902 So.2d at 782 (“[Withheld information, even if not itself admissible, can be material under
 
 Brady
 
 if its disclosure would lead to admissible substantive or impeachment evidence.” (quoting
 
 Rogers v. State,
 
 782 So.2d 373, 383 n. 11 (Fla.2001))).
 

 However, even if a further evidentiary hearing should have been held to explore the notes, and even if the notes concerning disposal of the murder weapon should have been disclosed, the third prong of Brady■— prejudice — has not been demonstrated. Other evidence not involving Smith’s testimony tied Hurst to the crimes — discarded tennis shoes in Hurst’s size, Hurst’s purchase of new tennis shoes that day, Michael Williams’ testimony that Hurst told him about the murder, Hurst’s fingerprint on the bank deposit slip, Hurst’s possession of a large amount of money on the day of the murder, and eyewitness testimony of Hess placing Hurst at the scene. Therefore, even if Hurst’s counsel had explored the inconsistency between the evidence of the box cutter inside Popeye’s and Smith’s statement contained in the Nesmith notes that Hurst disposed of the murder weapon, Hurst has not demonstrated a reasonable probability of a different result in his trial, i.e., a probability sufficient to undermine confidence in the outcome. Thus, because our confidence in the outcome of the guilt phase is not undermined by failure to disclose these notes, relief is denied on this claim.
 

 3. Nesmith’s Notes Regarding Laura Ussery
 

 Hurst also claimed in his supplemental motion, which was denied without further evidentiary hearing, that the State committed a
 
 Brady
 
 violation by not disclosing notes of Nesmith’s interview with a person named Laura Ussery, who did not testify at trial and was not disclosed to the defense. Hurst’s motion alleged that Ussery worked with, and was a good friend of, trial witness Michael Williams and that Michael Williams told Ussery about plans to rob both Popeye’s and Taco Bell. Michael Williams testified at trial that he had known Hurst for a long time and that Hurst told him about the murder. Williams testified that Hurst said he had gotten into an argument with a woman and hit her, cut her with a box cutter, and put her in the freezer. Williams also testified that he had heard Hurst and Smith talking about
 
 robbing
 
 Popeye’s on several occasions.
 

 Hurst now contends the Nesmith notes of Williams’ statement to Ussery indicate
 
 *1001
 
 Williams’ own plan to participate in the robbery of Popeye’s. The notes also stated that Williams told Ussery “his friend didn’t do it, the person arrested didn’t do it,” which Hurst argues contradicts Williams’ trial testimony that Hurst confessed to him, and is exculpatory for Hurst. Investigator Nesmith’s field notes stated that Ussery reported Williams saying:
 

 Popeye’s was going to get robbed, and someone would end up dead. And Taco Bell too. Said going to rob both store the same day. Said it was going to be one of his friends.... Since the incident at Popeye’s 5/2 Michael said his friend didn’t do it. The person arrested didn’t do it.
 

 In the order denying a further eviden-tiary hearing and finding the
 
 Brady
 
 claim to be without merit, the postconviction court found that the notes do not indicate Williams planned to be involved in the offense. We conclude that although the trial court was correct that the notes do not indicate Williams planned to participate in the robberies, the notes do contain information that defense counsel could have utilized in an attempt to impeach Williams’ trial testimony and to investigate the issue of other possible participants in the crime. Because the notes could have led to impeachment evidence, they constitute
 
 Brady
 
 material and should have been disclosed.
 

 The postconviction court ruled that the notes would not be admissible because they are hearsay not subject to any exception and do not involve an inconsistent statement or material fact to be used for impeachment at trial. However, as we stated earlier, information that is not itself admissible can still be material under
 
 Brady
 
 if it would lead to admissible substantive or impeachment evidence.
 
 Floyd,
 
 902 So.2d at 782 (citing
 
 Rogers,
 
 782 So.2d at 383 n. 11). We made clear in
 
 Rogers
 
 that even if the reports at issue were not admissible, “they can still serve as the basis for Rogers’
 
 Brady
 
 claim to the extent he could have investigated and used the information contained in the reports.” 782 So.2d at 383 n. 11. Even though we conclude that the notes should have been disclosed, we now must address the question of prejudice.
 

 Hurst has not demonstrated “a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.”
 
 Youngblood,
 
 547 U.S. at 870, 126 S.Ct. 2188 (quoting
 
 Strickler,
 
 527 U.S. at 280, 119 S.Ct. 1936). A reasonable probability of a different result “is a probability sufficient to undermine confidence in the outcome.”
 
 Strickland,
 
 466 U.S. at 694, 104 S.Ct. 2052;
 
 see also Strickler,
 
 527 U.S. at 290, 119 S.Ct. 1936. Even if the notes had been disclosed and Williams had been cross-examined about his comments to Us-sery or if defense counsel had used the notes to investigate who else may have been planning to rob Popeye’s and Taco Bell, we find no reasonable probability that the result of the guilt phase portion of the trial would have been different. That evidence would not have rebutted all the other evidence directly connecting Hurst to the crime, including testimony by Smith that Hurst confessed to murdering Harrison, Hurst’s fingerprints on the deposit slip, the discarded bloody tennis shoes, the newly purchased tennis shoes, the possession of money on the morning of the murder, and the eyewitness identification of Hurst at the scene.
 
 [7]
 
 We need not reach
 
 *1002
 
 the question of whether the Ussery notes could have led to evidence undermining our confidence in imposition of the death sentence in this case, because we vacate that sentence and remand for a new sentencing proceeding. Relief on this claim is therefore denied.
 

 4. Nesmith’s Notes Regarding Michael Williams
 

 Hurst’s supplemental motion also alleged that the State committed a
 
 Brady
 
 violation when it withheld Investigator Nesmith’s field notes pertaining to the interview directly with Michael Williams. The notes show that Williams reported to Nesmith that Hurst told him he needed to get his car fixed, which is consistent with Hurst’s alibi on the morning of the murder. The supplemental motion also alleged that the field notes show Williams told Nesmith that Hurst would always do what Smith told him, and that Smith told Michael Williams, “We got that motherfucker,” referring to the murder. Hurst contends that all this information was exculpatory and impeaching of other witnesses’ testimony and should have been disclosed.
 

 The postconviction court denied the claim without another hearing and held that a
 
 Brady
 
 violation was not demonstrated regarding Williams’ statements that Hurst needed to get his car fixed, because that testimony was cumulative to a number of other witnesses who testified to that same fact and would not have had any material effect on the outcome. As the trial court found, the jury heard evidence through Lola Hurst, Marie Hurst, Patti Hurst, Bertha Bradley, Timothy Bradley, and Hurst himself, in his recorded statement, that he had car trouble on the morning of the murder and needed to get his car fixed.
 

 As to that portion of the field notes that indicates Williams told Nesmith that Hurst would do whatever Smith told him to do, the postconviction court concluded that counsel already knew that fact from depositions taken in the case. The court stated: “These statements during the deposition are substantially similar to the information Defendant now alleges was withheld by the State.” The information in the notes was also cumulative to testimony in the penalty phase from Hurst’s mother that Hurst would do whatever Smith wanted him to do. The undisclosed notes concerning Michael Williams’ comments about Hurst doing whatever Smith wanted, and about Smith’s vague statement that “we got that motherfucker” even if presented in the guilt phase, do not satisfy the prejudice prong of
 
 Brady.
 

 Because the failure of the State to disclose the Nesmith notes relating to Michael Williams’ interview does not undermine our confidence in the result of the guilt phase of Hurst’s trial, relief is denied on this claim.
 

 5. Nesmith’s Notes Regarding Carl Hess
 

 Hurst’s supplemental motion also alleged a
 
 Brady
 
 claim and a
 
 Giglio
 
 claim based on Nesmith’s field notes concerning Carl Hess. Hurst claims the notes demonstrate that Hess gave undisclosed information to Nesmith that would have contradicted Hess’s trial testimony, as well as the trial testimony of David Kladitis. The motion claimed the timeline was vastly different in the Hess notes concerning when the victim arrived at work and would also have impeached Hess’s trial testimony that he interviewed Hurst, because the notes said Hess “saw suspect apply for job” at Wendy’s. The supplemental motion further alleged that Nesmith’s notes
 
 *1003
 
 of his interview with Hess contain impeachment evidence because the notes state that Hess said Hurst’s car was “possibly blue” and at trial stated the car conclusively was blue.
 

 The postconviction court denied a further evidentiary hearing on this supplemental claim, and denied the
 
 Brady
 
 and
 
 Giglio
 
 claims, stating:
 

 Clearly, the claimed false testimony [of Hess] was subjected to ample impeachment at trial. Any material effect the alleged false testimony would have had on the opinion of the jury was negated by trial counsel[ ] through impeachment.
 

 Because Hess testified at the evidentiary hearing, and because the trial court considered the field notes relating to his interview with Investigator Nesmith, the trial court did not err in denying the claim without an additional evidentiary hearing. Further, we agree that Hurst has failed to establish either a
 
 Brady
 
 or a
 
 Giglio
 
 violation by the State’s failure to disclose Nes-mith’s field notes of his interview with Hess.
 

 The fact that Hess told Nesmith he “saw suspect apply for a job” is not clearly inconsistent with or impeaching of Hess’s trial testimony that he knew Hurst because Hurst applied for a job at Wendy’s. In Hess’s direct examination, Hurst said only that he knew Hurst from having seen him coming and going and because Hurst had “filled an application out at Wendy’s.” Hess was severely impeached during cross-examination and his additional claim to have “interviewed” Hurst was shown to be unlikely, if not actually false, by the testimony of his supervisor, Sun Nguyen.
 

 Nor does it appear that the field notes contain exculpatory or impeachment information relating to the timeline in which Hess said he saw the victim arrive. Nes-mith’s notes indicate Hess said he saw Harrison arrive at 7:15 a.m., while at trial he testified he saw her arrive “anywhere between 7:00 and 8:30.” This timeline set forth in the Nesmith notes is not inconsistent with Hess’s trial testimony and does not provide any exculpatory or impeachment evidence. Hurst also argues that the notes concerning when Hess saw Harrison arrive would impeach the testimony of Kladitis. This is also incorrect. Kladitis testified at trial that he was next to the Popeye’s parking lot and saw Harrison drive by at “7:20 — 7:15 to 7:20.” At the evidentiary hearing, Kladitis testified that he saw Harrison drive by at “7:20 — 7:15 to 7:20.” Therefore, the Nesmith note of Hess’s observation of the victim’s arrival at 7:15 a.m. is not inconsistent with his trial testimony and is actually consistent with the trial testimony of Kladitis.
 

 The State’s failure to disclose the notes regarding Hess is not a
 
 Brady
 
 violation because the notes are not exculpatory or impeaching and do not provide any basis to undermine our confidence in the verdict. Nor does the information in the notes demonstrate a
 
 Giglio
 
 violation, because it does not indicate that the State presented, or failed to correct, any false testimony at trial. Moreover, because of the strength of other evidence tying Hurst directly to the murder, any error in failure to disclose the Hess notes cannot reasonably be said to have contributed to Hurst’s conviction. Therefore, relief is denied on this claim.
 

 B.
 
 Anderson
 
 Claim Based on Testimony of Hess
 

 Hurst claims a violation of
 
 Anderson v. State,
 
 574 So.2d 87 (Fla.1991), contending that the State prosecuted him on an indictment obtained after Carl Hess lied to the grand jury by testifying that he interviewed Hurst. In
 
 Anderson,
 
 we held that “due process is violated if a prosecutor permits a defendant to be tried upon an indictment which he or she knows is based on perjured, material testimony
 
 *1004
 
 without informing the court, opposing counsel, and the grand jury.”
 
 Id.
 
 at 91. The postconviction court denied the claim, finding that the evidence did not support the claim that Hess lied before the grand jury. We agree with this assessment.
 

 Hess testified at a postconviction eviden-tiary hearing July 9, 2004, that the matter of whether he interviewed Hurst “did not come up” when he testified before the grand jury. The following colloquy took place:
 

 Q. [defense counsel]: Do you recall if you testified at the grand jury that you interviewed Mr. Hurst?
 

 A. It never came up.
 

 [[Image here]]
 

 Q. In any event, if the record reflects that you did testify at the grand jury and you testified that you interviewed Mr. Hurst, that’s not true?
 

 A. It never came up.
 

 We are aware that Hess made a statement in his September 14, 1998, deposition prior to the trial in this case, which could be interpreted as indicating he told the grand jury, falsely, that he interviewed Hurst. Hess testified in that deposition as follows:
 

 Q. [defense counsel] How long was your interview with the gentleman you chose not to recommend?
 

 A. About twenty minutes, half an hour.
 

 Q. When the police asked you about him, did they ask you whether there was any paperwork that he might have filled out?
 

 A. No, ma’am.
 

 Q. Did you think of the possibility that there might have been some paperwork and whether to retrieve it or not?
 

 A. No, they didn’t ask me about that. Actually, I didn’t tell them I interviewed him until I was in front of the grand jury. You know, I said I knew him personally.
 

 However, at the
 
 Huff
 
 hearing held in this postconviction proceeding on March 18, 2005, defense counsel expressly rejected any reliance on Hess’s deposition for this claim.
 

 Even if Hess gave false testimony about interviewing Hurst when he testified before the grand jury, relief would not be warranted, because the testimony was not material in any respect that would have affected the indictment issued in the cause. We held in
 
 Anderson
 
 that relief will not be granted if the testimony, even if false in part, “was not false in any material respect that would have affected the indictment.”
 
 Id.
 
 at 92;
 
 see also Evans v. State,
 
 808 So.2d 92, 101 (Fla.2001) (same, citing Anderson). In this case, Hess had other bases to support his identification of Hurst. Hess provided Hurst with an application for Wendy’s employment and was later handed the completed application by Hurst. Hess also worked in the parking lot of Wendy’s where he saw Hurst coming and going at Popeye’s. Additionally, Hess’s testimony was not the only evidence heard by the grand jury before the indictment was handed down. Michael Williams testified before the grand jury, telling them that Hurst confessed that he cut the victim with a box cutter. Lee-Lee Smith testified before the grand jury as well. Therefore, trial court did not err in denying Hurst’s
 
 Anderson
 
 claim without another evidentiary hearing, and relief is denied on this claim.
 

 C. Alleged Ex Parte Communication
 

 Hurst next contends that that an improper ex parte conversation occurred during his trial when Judge Tarbuck asked prosecutor Rimmer if Lee-Lee Smith would be charged in connection with the Popeye’s crimes. This claim arose after Rimmer testified at the initial evidentiary
 
 *1005
 
 hearing, “I never even really made a decision to [charge Smith] until the case was over and Judge Tarbuck called me up to the bench and asked me why Lee-Lee had not been charged.” Rimmer could not recall exactly when the conversation occurred, and testified that it could have occurred before or after the penalty phase. Hurst was allowed to depose Judge Tar-buck, who stated that he did not recall witness Lee-Lee Smith and did not recall any conversation with the prosecutor about Smith being charged. Rimmer was also deposed on the issue approximately a year after his evidentiary hearing testimony and testified that he thought the conversation with Judge Tarbuck probably occurred after the verdict, at the conclusion of Hurst’s guilt phase case, and confirmed that Hurst’s defense counsel was not present at the conversation.
 

 The postconviction court, with a different circuit judge now presiding, denied the claim of improper ex parte communication without a further evidentiary hearing and concluded:
 

 Defendant has failed to establish that he was deprived of a neutral, detached judge. The Court finds that the communication in question was limited to matters concerning Lee-Lee Smith and had no bearing on the judge’s treatment of Defendant either during trial or during sentencing. Defendant is not entitled to relief as to this claim.
 

 We agree that the conversation was not an improper substantive ex parte communication about the merits of Hurst’s case and that it in no way prejudiced Hurst or deprived him of a neutral, detached judge.
 

 Canon 3 B(7) of the Code of Judicial Conduct provides in pertinent part that “[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding.” We have recognized that “there is nothing ‘more dangerous and destructive of the impartiality of the judiciary than a one-sided communication between a judge and a single litigant.’ ”
 
 Randolph v. State,
 
 853 So.2d 1051, 1057 (Fla.2003) (quoting
 
 Spencer v. State,
 
 615 So.2d 688, 691 (Fla.1993)). Without question, an ex parte communication in a capital case in which the trial court delegates the job of evaluating sentencing factors and preparation of the sentencing order to the prosecution is improper and will require reversal.
 
 See, e.g., State v. Riechmann, 111
 
 So.2d 342, 351 (Fla.2000). That is not what occurred here.
 

 Even where an improper communication occurs, reversal is not automatic. In
 
 Randolph,
 
 we found that an improper ex parte communication took place between the judge and the prosecutor, who were discussing the wording of the sentencing order, but agreed with the post-conviction court that a new trial was not necessary because “Randolph’s right to a neutral judge was not violated by the improper ex parte communication in this case.”
 
 Randolph,
 
 853 So.2d at 1057. We have also considered the importance of the nature of the contact between the judge and the prosecutor in evaluating whether an ex parte communication is improper.
 
 See id.
 
 at 1058;
 
 Card v. State,
 
 652 So.2d 344, 346 (Fla.1995) (noting that the post-conviction court should consider the nature of the contact between the trial judge and the prosecutor).
 

 In the instant case, the nature of the contact was solely related to whether Smith would be charged in a separate prosecution — a matter not directly involving Hurst or the charges against him. If anything, the exchange indicates concern about Smith’s culpability in the crime, a concern that is not prejudicial to Hurst or
 
 *1006
 
 inconsistent with Judge Tarbuck’s neutrality in Hurst’s case. In evaluating a claim of improper ex parte communication in
 
 Tompkins v. State,
 
 872 So.2d 230 (Fla.2003), we explained:
 

 Tompkins is not entitled to a new penalty phase because he has not demonstrated that he was denied his right to a neutral, detached judge or that Judge Coe failed to independently weigh the aggravating and mitigating circumstances.
 

 Id.
 
 at 245. Similarly, In this case, no claim has been made, and we see no evidence in the record, that the ex parte communication concerning Smith deprived Hurst of a neutral, detached judge. Because there is no basis to conclude that Hurst was deprived of a neutral, detached judge or that any of the trial judge’s rulings or decisions were prejudicially affected by the communication, relief is denied on this claim.
 

 D. Willie Griffin’s Affidavit and Testimony
 

 Hurst next contends the trial court erred in summarily denying his third supplemental motion, claiming that a new trial should be granted because trial witness Willie Griffin recanted his trial testimony that Hurst confessed. Hurst also contends the postconviction court erred in denying his motion to perpetuate Griffin’s testimony. We agree that the trial court erred in denying the motion to perpetuate testimony. Nevertheless, as we explain below, we conclude that relief is not warranted on this claim.
 

 Griffin testified at Hurst’s jury trial that when he was in jail with Hurst in Escam-bia County after the Popeye’s murder, Hurst told him, “I did that swine, and ‘F’ the rest of them.” He testified that Hurst did not show any remorse for the crime. Referring to the murder victim, Griffin testified that Hurst told him “they didn’t get along in the first place, and she was like slow or something like that, like something was wrong with her mentally.” Griffin admitted at trial that he tried unsuccessfully to get a visitation favor from the prosecutor and that he had also volunteered to testify against another inmate.
 
 [8]
 

 Postconviction counsel obtained a sworn affidavit in which Griffin stated that Hurst actually professed his innocence several times; that Griffin’s testimony at trial that Hurst said, “I did that swine” was fabricated; and that when Hurst actually said, “Fuck that swine,” Griffin was not sure to whom Hurst was referring. The affidavit also averred that Griffin’s testimony was “entirely based on emotion, based on what I was told by the State and law enforcement.”
 

 The trial court initially granted an evi-dentiary hearing on the claim, but postcon-viction counsel could not secure the attendance of Griffin, who was a federal prisoner at Fort Dix. Counsel’s unsuccessful attempts to secure Griffin’s appearance resulted in his advising the court that, due to the Interstate Agreement on Detainers, only the prosecuting authority could obtain Griffin’s presence in Florida. The State did not agree to assist in obtaining Griffin’s presence, expressing concern about setting “a precedent where the State is essentially responsible for assisting the defense to get their witness.”
 

 Hurst then filed a sworn motion under Florida Rule of Criminal Procedure 3.190(j)(l) asking the court to perpetuate Griffin’s testimony, with an alternative re
 
 *1007
 
 quest to compel the State’s assistance in obtaining Griffin’s appearance. That motion was denied. Hurst then attempted to support his claim with the affidavit by Griffin, but the court concluded that the unauthenticated affidavit in which Griffin recanted part of his trial testimony would be inadmissible and denied the evidentiary hearing based on the fact that Griffin’s attendance could not be secured. The court stated, “Postconviction counsel is unable to obtain physical custody of the witness from federal custody. As such, this Court finds that the witness is unavailable to testify at an evidentiary hearing.” The postconviction court also denied the written proffer containing the affidavit.
 

 Rule 3.190(j) “applies to trials, not to postconviction proceedings where discovery is limited and substantial discretion is afforded the trial court,” and “[t]he decision whether to grant a motion to perpetuate testimony lies within the discretion of the trial court.”
 
 Riechmann v. State,
 
 966 So.2d 298, 310 (Fla.2007) (quoting
 
 Cherry v. State,
 
 781 So.2d 1040, 1054 (Fla.2000)). We found no abuse of discretion in denial of a motion to perpetuate testimony in
 
 Riechmann,
 
 where the motion was not under oath or accompanied by sworn affidavits and there was no assertion as to the exact location of the witness. In the present case, however, Hurst’s sworn motion met the requirements of the rule and Griffin’s exact location was stated in the motion. The court denied the motion to perpetuate testimony, citing the “speculative nature of Defendant’s pleadings” and because the court was “not convinced that Griffin could have been held accountable for his proposed deposition testimony.” The court also agreed with the State that “the State should not have to be responsible for retrieving Defendant’s witnesses.” After rejecting Hurst’s requests for assistance in obtaining the testimony of Griffin, the court found Hurst had failed to present reliable admissible evidence that Griffin had recanted, thus denying the claim. Because Hurst’s motion was in proper form and was relevant to his claim of newly discovered evidence, and because his counsel had no other way to secure Griffin’s testimony, we conclude that the trial court abused its discretion in denying the motion to perpetuate Griffin’s testimony. Nevertheless, we conclude that even if Griffin’s testimony had been obtained and he had testified in accord with his affidavit, relief would not be warranted in this case.
 

 Because the affidavit is not a clear recantation of all Griffin’s trial testimony, his partial recantation would not be newly discovered evidence of such a nature that it would probably produce an acquittal on retrial, as required by
 
 Jones,
 
 709 So.2d at 521. Nor does it appear that it would “weaken[ ] the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability.”
 
 Id.
 
 at 526 (quoting
 
 Jones v. State,
 
 678 So.2d 309, 315 (Fla.1996)). Even without Griffin’s testimony, ample evidence remained upon which the jury could find Hurst guilty, including his confession to Lee-Lee Smith, Hurst’s fingerprints on the bank deposit slip, his possession of a large sum of money on the morning of the murder, and his disposal of large-size tennis shoes bearing indications of blood, along with his purchase of new tennis shoes on the morning of the murder. Thus, relief is denied on this claim.
 

 IV. PENALTY PHASE CLAIM AFTER EVIDENTIARY HEARING
 

 Ineffective Assistance of Counsel in Investigation and Presentation of Mental Mitigation in the Penalty Phase
 

 Hurst contends that trial counsel failed to adequately investigate and present mental mitigation evidence of his low IQ, bor
 
 *1008
 
 derline intellectual functioning, and possible organic brain damage caused by fetal alcohol syndrome, all of which would have established statutory and nonstatutory mitigation and could have provided the jury with a basis to recommend life.
 
 [9]
 
 For the reasons set forth below, we agree that trial counsel was ineffective in failing to investigate and present evidence of mental mitigation in this case. Accordingly, we vacate the sentence of death and remand for a new penalty phase proceeding.
 

 Standard of Review
 

 As explained earlier, under the deficiency prong of
 
 Strickland,
 
 the defendant must establish that counsel’s performance was deficient, i.e., that counsel’s performance was “outside the broad range of reasonably competent performance under prevailing professional standards.”
 
 Maxwell,
 
 490 So.2d at 932. “[Tjhere is a strong presumption that trial counsel performed effectively,”
 
 Lynch,
 
 2 So.3d at 56, and in determining deficiency, “[n]o particular set of detailed rules for counsel’s conduct can satisfactorily take account of the varietj'' of circumstances faced by defense counsel.”
 
 Id.
 
 at 81 (quoting
 
 Strickland,
 
 466 U.S. at 688-89, 104 S.Ct. 2052). Furthermore, the Court remains “cognizant of the danger in assessing the adequacy of counsel’s investigation and preparation through the distorting lens of hindsight and take[s] care to evaluate the performance through counsel’s perspective at the time.”
 
 Blackwood v. State,
 
 946 So.2d 960, 973 (Fla.2006) (citing
 
 Strickland,,
 
 466 U.S. at 689, 104 S.Ct. 2052). Nevertheless, it is axiomatic that “counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.”
 
 Strickland,
 
 466 U.S. at 691, 104 S.Ct. 2052. We reiterate that trial counsel’s “strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.”
 
 Occhicone,
 
 768 So.2d at 1048.
 

 Under the prejudice prong of
 
 Strickland,
 
 the defendant must prove that “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.”
 
 White v. State,
 
 964 So.2d 1278, 1285 (Fla.2007) (quoting
 
 Strickland,
 
 466 U.S. at 694, 104 S.Ct. 2052). Importantly, that reasonable probability is evaluated and expressed in terms of “a probability sufficient to undermine confidence in the outcome.”
 
 Id.
 

 We begin with the premise that “an attorney’s obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated because this is an integral part of a capital case.”
 
 State v. Pearce,
 
 994 So.2d 1094, 1102 (Fla.2008). In order to determine if trial counsel fulfilled his obligation to investigate and prepare for the penalty phase in this ease, we first examine the deficiency prong of the
 
 Strickland,
 
 test for ineffective assistance of counsel.
 

 
 *1009
 
 A. Deficiency
 

 During the penalty phase of trial, no expert testimony of mental mitigation was presented. Defense counsel did not have Hurst examined by a mental health expert prior to the penalty phase, even though Hurst’s former counsel, an assistant public defender, had filed a motion for a mental evaluation. When the court took up the motion, Hurst’s trial attorney stated that he did not see any reason to have Hurst examined. Thus, the motion for mental evaluation was denied and no mental evaluation was ever done. Nor did counsel obtain and present school records of the defendant, who was just nineteen at the time of the crime. The records would have shown that Hurst had a low IQ, was in special education classes, and dropped out of school after repeating tenth grade.
 

 Hurst argues that, on proper investigation and mental evaluation of the defendant, trial counsel could have discovered the same statutory and nonstatutory mental mitigation that was presented at the evidentiary hearing. In the order denying postconviction relief, the postconviction court noted that “Defendant has now been examined by a mental health expert and both statutory and nonstatutory mitigation is available for the Court’s consideration.” However, the postconviction court held that defense counsel was not ineffective in failing to have Hurst examined by a mental health expert because counsel followed the wishes of his client not to be examined; counsel did not observe anything about Hurst that would have required a mental health evaluation; and counsel believed that mental mitigation would have conflicted with his claim of innocence in the guilt phase.
 

 Defense counsel Raymond Glenn Arnold testified that he “didn’t think that a shrink would find a mental problem,” and that he believed he was going to win the guilt phase.
 
 [10]
 
 He explained to the postconviction court, “I had to prepare for the penalty phase, even though at that time I thought I was going to win the guilt phase.” He then testified concerning his discussion of mental mitigation for use in the penalty phase with Hurst, stating:
 

 [ I]f they convict you, I’ve got to put on testimony about ... mitigation.... I told him that one of the ways of doing that was through mental health testimony ... and I told him I’d have to have a shrink examine him. And it really didn’t go a heck of a lot further than that. It was basically, no, I don’t want to do that.... And Tim wasn’t overly helpful in that particular area, by the way.
 

 Counsel contended that he was simply following the wishes of his client not to be examined. This contention would be more persuasive if defense counsel had actually given Hurst a complete explanation of the purpose of mitigation and the benefit of having a psychological examination to uncover potential mental mitigation — and if Hurst had then made an informed decision to forego all mental mitigation. We have held that “[ajlthough a defendant may waive mitigation, he should not do so blindly.”
 
 Pearce,
 
 994 So.2d at 1102. In this case, trial counsel’s explanation that he told Hurst he would have to have him examined by a “shrink” does not rise to the level of an explanation why a psychological evaluation would be necessary or helpful in the penalty phase of a capital trial. Moreover, Hurst’s simple statement that he did not want to be examined can
 
 *1010
 
 not be construed as a clear directive to trial counsel to forego all mental mitigation. Counsel did not make any investigation to determine whether a decision to forego mental mitigation, if such was made by Hurst, was fully informed.
 

 The evidence presented at the evidentia-ry hearing established that significant mental mitigation was available and could have been presented in the penalty phase of trial if Hurst had been examined by a mental health expert. Psychologist Dr. Valerie McClain testified that Hurst was a below-average student in special education courses, that he dropped out of school after repeating the tenth grade, and had an IQ score of 70 on the Wechsler Abbreviated Scale of Intelligence test, which she administered. On the full Wechsler Intelligence Scales test, administered by an employee of State’s witness Dr. James Larson, Hurst demonstrated a full scale IQ of 78. Dr. McClain testified that Hurst exhibited mental deficits, especially in the area of memory and reasoning, and verbal fluency deficits, as well as below average adaptive functioning skills.
 
 [11]
 
 Testing also disclosed that Hurst was functioning at only a fourth-grade level in reading and a fifth-grade level in math. In her opinion, neuropsychological testing suggested Hurst suffered from brain damage that was consistent with fetal alcohol syndrome caused by his mother’s heavy drinking during pregnancy, although a formal diagnosis of fetal alcohol syndrome would need to be made by a physician.
 

 In
 
 Jones v. State,
 
 998 So.2d 573 (Fla.2008), we explained:
 

 Where available information indicates that the defendant could have mental health problems, “such an evaluation is ‘fundamental in defending against the death penalty.’ ”
 
 Arbelaez,
 
 898 So.2d at 34 (quoting
 
 Bruno v. State,
 
 807 So.2d 55, 74 (Fla.2001) (Anstead, J., concurring in part and dissenting in part)).
 

 Id.
 
 at 583. This type of investigation is especially critical where, as here, counsel believed Hurst was waiving his right to present such mental mitigation by merely indicating that he did not want to be examined by a “shrink.” Moreover, a reasonable investigation into mental mitigation is part of defense counsel’s obligation where there is any indication that the defendant may have mental deficits.
 

 Although trial counsel testified that he personally saw nothing that would have required a psychiatric or psychological examination, in assessing the reasonableness of counsel’s investigation and decision not to obtain a mental health evaluation in this case, the Court “must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.”
 
 Wiggins v. Smith,
 
 539 U.S. 510, 527, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). We conclude that the evidence and information available to Hurst’s counsel was sufficient to place him on notice that further investigation of mental mitigation was necessary; consequently, his decision not to pursue it was not reasonable under the circumstances of this case.
 

 The record established that counsel was presented with information from Hurst’s family that indicated he probably had borderline intellectual functioning and was emotionally immature. Counsel could eas
 
 *1011
 
 ily have discovered that Hurst was in special education classes, had repeated tenth grade, and dropped out of school, just as Dr. McClain discovered. Similarly, reasonable investigation by counsel based on information suggesting that Hurst had a low IQ would likely have disclosed, just as the psychologists testified at the evidentia-ry hearing, that Hurst had an IQ of somewhere between 70 and 78.
 

 Dr. McClain was also of the opinion that Hurst exhibited organic brain damage based on fetal alcohol syndrome. According to his evidentiary hearing testimony, trial counsel did know that Hurst’s mother drank heavily during her pregnancy. He also knew that Hurst might have suffered from fetal alcohol syndrome because of his mother’s alcohol abuse, but counsel appeared to be unsure how he could have used that fact in mitigation. As to possible mitigation of brain damage caused by fetal alcohol syndrome, counsel said:
 

 It was my understanding — in fact, one time I even thought about fetal alcohol syndrome. But, no. It’s so difficult to establish that defense.... I did not use it, no. I didn’t think it worthwhile frankly.
 

 This comment by counsel indicates some confusion over the purpose of evidence to be used in mitigation versus evidence to be used as “a defense” to the murder. Reasonable investigation of the ramification of the fact that Hurst’s mother drank heavily during her pregnancy would have turned up evidence similar to that found by Dr. McClain, indicating that Hurst probably had organic brain damage resulting from fetal alcohol syndrome. At a minimum, the information possessed by trial counsel provided a reasonable basis to request an examination of Hurst to explore the question of fetal alcohol syndrome and to determine his IQ level at the time of the crime. Mitigation of this significance, indicating that Hurst’s IQ was possibly as low as 70 and that he likely had organic brain damage, would have been significant, relevant mental mitigation, including statutory mitigation, in a case in which the only mitigation that was presented was insignificant.
 

 Recently, in
 
 Parker v. State,
 
 3 So.3d 974 (Fla.2009), we reversed for a new penalty phase where counsel presented only “bare bones” mitigation at trial and where substantial mental mitigation and mitigation concerning Parker’s childhood were discovered and presented at the postconviction evidentiary hearing.
 
 Id.
 
 at 984. The Court stated, “The ABA Guidelines provide that investigations into mitigating evidence ‘should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.’ ”
 
 Id.
 
 at 984-85 (quoting the American Bar Association,
 
 Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases
 
 guideline 11.4.1(C), at 93 (1989)). “Among the topics that counsel should consider presenting in mitigation are the defendant’s medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences.”
 
 Parker,
 
 3 So.3d at 985 (citing ABA guideline 11.8.6, at 133). In this case, counsel not only failed to investigate mental mitigation reasonably suggested by available evidence, he also failed to present the relevant features of Hurst’s educational background and school records, which showed Hurst was a special education student with borderline intelligence who dropped out of school after repeating the tenth grade.
 

 The State urges that defense counsel had a reasonable strategy to only present Hurst as a good person and that the mental mitigation would have conflicted with
 
 *1012
 
 Hurst’s guilt phase claim of innocence. It is true that we have held that a penalty phase strategy of “humanizing” or showing only the good characteristics of a defendant is not necessarily deficient where the strategy is “ ‘dictated’ by the defendant’s insistence on his innocence.”
 
 Sliney v. State,
 
 944 So.2d 270, 285 (Fla.2006) (citing
 
 Rutherford v. State,
 
 727 So.2d 216, 223 (Fla.1998)). However, in both
 
 Sliney
 
 and
 
 Rutherford,
 
 the trial attorney had a sound reason for believing the omitted mitigation would have been harmful in some respect to the defendant’s case.
 

 In
 
 Sliney,
 
 the defendant was examined by a mental health expert prior to the penalty phase, and the report supplied to counsel contained substantial harmful information about the defendant and would have been inconsistent with other mitigation.
 
 Id.
 
 at 283;
 
 see also Sexton v. State,
 
 997 So.2d 1073, 1084 (Fla.2008) (holding that counsel was not ineffective in failing to present mental mitigation that would have opened the door to testimony that the defendant was a sadistic sexual psychopath);
 
 Hodges v. State, 885
 
 So.2d 338, 348 (Fla.2004) (“In light of evidence demonstrating that counsel pursued mental health mitigation and received unusable or unfavorable reports, the decision not to present the experts’ findings does not constitute ineffective assistance of counsel.”);
 
 Gaskin v. State,
 
 822 So.2d 1243, 1248 (Fla.2002) (“Trial counsel will not be held deficient when she makes a reasonable strategic decision to not present mental mitigation ... because it could open the door to other damaging testimony.”);
 
 Haliburton v. Singletary,
 
 691 So.2d 466, 471 (Fla.1997) (counsel not deficient for not presenting mental mitigation of brain damage where testimony would have disclosed that Hali-burton was extremely dangerous and likely to kill again). Notable in the foregoing cases is the fact that counsel obtained mental evaluations and then made the decision that their presentation would be more harmful than helpful.
 

 In
 
 Rutherford,
 
 we held that defense counsel properly relied on a strategy of “humanizing” the defendant rather than exposing his alcoholism and anxiety disorder, which were noted in pretrial mental evaluations.
 
 Rutherford,
 
 727 So.2d at 224. In so holding, we distinguished between counsel’s infoi’med actions in
 
 Rutherford
 
 and those cases in which counsel made a decision to forego mental mitigation without making any meaningful investigation.
 
 Id.
 
 at 223. One such example is
 
 Rose v. State,
 
 675 So.2d 567 (Fla.1996), where we reversed because trial counsel’s mitigation decisions were “neither informed nor strategic” and “there was no investigation of options or meaningful choice.”
 
 Id.
 
 at 572-73. In
 
 Rose,
 
 counsel failed to uncover mitigation evidence that Rose was a slow learner with an IQ of 84, he suffered from organic brain damage, and his ability to appreciate the criminality of his conduct was impaired.
 
 Id.
 
 at 571.
 

 In this case, no sound basis appears
 
 for
 
 Hurst’s defense counsel to have failed to investigate and present mitigation evidence of Hurst’s borderline intelligence, which was at a lower level than in
 
 Rose,
 
 possible organic brain damage similar to that in
 
 Rose,
 
 and other mental mitigation. The evidence did not carry with it any harmful factors, such as in
 
 Sliney
 
 and
 
 Rutherford,
 
 which could have defeated the effect of the mitigation. No evidence was presented to show that Hurst’s mental mitigation would have opened the door to any damaging testimony.
 

 In his mitigation strategy in this case, defense counsel relied mainly on the fact that his guilt phase case was based on a claim of innocence. He testified that he believed presentation of any mitigation other than the fact that Hurst was a good
 
 *1013
 
 person would have been inconsistent with that theory. However, because counsel never had Hurst examined and could not know what a mental health expert might discover, he could not make an informed tactical decision that the mental mitigation would be inconsistent with the defense or with other mitigation. Moreover, presentation of the mental mitigation discovered in this case — that Hurst had borderline intellectual functioning, cognitive deficits, and possible brain damage — would not have been an admission that he committed the murder but would have been
 
 consistent
 
 with and supportive of the other mitigation that Hurst was slow, emotionally immature, and a follower.
 

 Even if counsel did not want to present mental mitigation to the jury because of concerns relating to credibility or inconsistency, there is no explanation how presenting such mitigation at the Spencer
 
 [12]
 
 hearing would have been detrimental. Counsel’s decision to forgo any mental evaluation resulted in his failure to discover significant mental mitigation, as well as educational history, that could have been presented as mitigation either to the jury or just to the trial court. In fact, no additional evidence was presented at the
 
 Spencer
 
 hearing held April 17, 2000.
 

 We reiterate the principle that not every capital defendant requires a mental evaluation, but where, as here, available information indicates that the defendant could have significant mental health problems, counsel will be deficient in failing to investigate the defendant’s mental condition for purposes of mitigation. Because there was no reasonable, strategic reason not to present any mental mitigation during the penalty phase of Hurst’s trial, and a reasonable investigation would have disclosed statutory and nonstatutory mitigation that could have shored up the otherwise weak mitigation, counsel was deficient in his performance under the first prong of
 
 Stride-land.
 
 This does not end our inquiry, however. We now examine whether counsel’s deficient performance prejudiced Hurst in the penalty phase of his trial.
 

 B. Prejudice Prong
 

 Penalty phase prejudice under the
 
 Strickland
 
 standard is measured by whether the error of trial counsel undermines this Court’s confidence in the sentence of death when viewed in the context of the penalty phase evidence and the miti-gators and aggravators found by the trial court. This Court has explained:
 

 In assessing prejudice, we reweigh the evidence in aggravation against the totality of the mental health mitigation presented during the postconviction evi-dentiary hearing to determine if our confidence in the outcome of the penalty phase trial is undermined.
 
 See Rutherford v. State,
 
 727 So.2d 216, 223 (Fla.1998) (stating that in assessing prejudice “it is important to focus on the nature of the mental mitigation” now presented);
 
 see also Wiggins,
 
 539 U.S. at 534, 123 S.Ct. 2527 (“In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.”).
 

 Hannon v. State,
 
 941 So.2d 1109, 1134 (Fla.2006). In the present case, the facts of the murder established that it was especially heinous, atrocious or cruel, an aggra-vator that was found and given great weight by the trial judge. The facts also established that the murder was committed during a robbery, an aggravator that
 
 *1014
 
 was also found and given great weight by the trial judge.
 

 Nevertheless, “we have consistently recognized that severe mental disturbance is a mitigating factor of the most weighty order, and the failure to present it in the penalty phase may constitute prejudicial ineffectiveness.”
 
 Rose,
 
 675 So.2d at 573 (citations omitted);
 
 see also Phillips v. State,
 
 608 So.2d 778, 783 (Fla.1992) (prejudice established by “strong mental mitigation” that was “essentially unrebutted”);
 
 Mitchell v. State,
 
 595 So.2d 938, 942 (Fla.1992) (affirming trial court’s oi’der for a new penalty phase because statutory and nonstatutory mitigation showing brain damage, drug and alcohol abuse, and child abuse was not presented by counsel);
 
 State v. Lara,
 
 581 So.2d 1288, 1289 (Fla.1991) (prejudice established by evidence of statutory mitigating factors and abusive childhood that was not presented because counsel “virtually ignored” the penalty phase). In
 
 Hildwin v. Dugger,
 
 654 So.2d 107 (Fla.1995), we reversed for a new penalty phase because trial counsel’s investigation was “woefully inadequate” and failed to discover “an abundance of mitigating evidence which his trial counsel could have presented at sentencing,” in addition to the lay witnesses who testified, and which would have established statutory mental mitigation.
 
 Id.
 
 at 109-10.
 

 Thus, mental mitigation that establishes statutory and nonstatutory mitigation can be considered to be a weighty mitigator, and failure to discover and present it, especially where the only other mitigation is insubstantial, can therefore be prejudicial. We do not overlook the fact that this murder was especially heinous, atrocious or cruel or that the robbery ag-gravator clearly exists. However, Hurst was only nineteen at the time of the murder and had no criminal background. Dr. McClain testified to the existence of Hurst’s substantial impairment of capacity to appreciate the criminality of his act, a statutory mitigator. She also testified to the statutory mitigator that Hurst was under extreme duress or domination of another. Mitigation consisting of borderline intelligence, impaired intellectual functioning, possible organic brain damage and fetal alcohol syndrome — all considered strong mitigators — as well as Hurst’s educational history, including his special education courses and educational failures, would not have been insignificant in this case. This testimony could have been presented to the jury to augment the “negligible” and “minimal” mitigation noted by this Court on direct appeal.
 
 Hurst,
 
 819 So.2d at 702.
 

 We also note that both the prosecutor and the trial judge criticized the lack of any mental health expert testimony in the penalty phase of the trial. The prosecutor argued to the jury that although Hurst’s mother testified he had the emotional age of ten or eleven:
 

 [ T]here has been no reliable professional expert testimony that any kind of psychological testing has ever been done on him to determine that he is any age emotionally.... If he’s never had any psychological testing, then I think it’s reasonable to infer that there has never been any reason to have him tested psychologically or emotionally.... You haven’t heard any testimony from any type of a mental health expert to say that he has any type of mental condition that limits his capacity to understand the criminality of his acts.
 

 Tellingly, the trial court specifically noted the lack of any mental health expert testimony, stating:
 

 The only evidence offered by the Defendant to establish this factor was the testimony of his mother who claimed that Defendant is ten years old emotion
 
 *1015
 
 ally. There was no testimony from any mental health expert to corroborate this testimony.... There is absolutely no evidence that the Defendant’s capacity was impaired.
 

 Thus, it can be seen that failure to present the mental mitigation that was available had an identifiable detrimental effect on the process of weighing the aggravation and mitigation in this case.
 

 As the postconviction court found, after hearing the mental health experts’ testimony at the evidentiary hearing, both statutory and nonstatutory mitigation is available for consideration that was not available during the penalty phase of Hurst’s trial. There appears to be no countervailing “double-edged” sword to presentation of this mitigation — it did not indicate antisocial personality disorder or another unfavorable psychiatric condition and was not inconsistent with Hurst’s “not guilty” posture. Because this mitigation was not made available for the jury or the trial judge to consider before the death sentence was imposed, our confidence in the imposition of the death penalty in this case is undermined. Accordingly, we must vacate the death sentence in this case and remand for a new penalty phase proceeding.
 

 V. CUMULATIVE ERROR
 

 Hurst contends that the cumulative effect of errors in this case deprived him of a fundamentally fair trial and undermines confidence in the result of the capital proceedings. Where multiple errors are found, even if deemed harmless individually, “the cumulative effect of such errors” may “deny to defendant the fair and impartial trial that is the inalienable right of all litigants.”
 
 Brooks v. State,
 
 918 So.2d 181, 202 (Fla.2005) (quoting
 
 Jackson v. State,
 
 575 So.2d 181, 189 (Fla.1991));
 
 see also McDuffie v. State,
 
 970 So.2d 312, 328 (Fla.2007). Where several errors are identified, the Court “considers the cumulative effect of evidentiary errors and ineffective assistance claims together.”
 
 Suggs v. State,
 
 928 So.2d 419, 441 (Fla.2005). However, where the alleged errors urged for consideration in a cumulative error analysis are individually “either procedurally barred or without merit, the claim of cumulative error also necessarily fails.”
 
 Israel v. State,
 
 985 So.2d 510, 520 (Fla.2008) (quoting
 
 Parker v. State,
 
 904 So.2d 370, 380 (Fla.2005));
 
 see also Rogers v. State,
 
 957 So.2d 538, 555 (Fla.2007);
 
 Wright v. State,
 
 857 So.2d 861, 871 (Fla.2003);
 
 Downs v. State,
 
 740 So.2d 506, 509 n. 5 (Fla.1999).
 

 We have concluded that the State should have disclosed certain of Investigator Nes-mith’s field notes and that the trial court’s refusal to perpetuate the testimony of Willie Griffin was an abuse of discretion. However, as explained above, no prejudice accrued from these errors. Because we also conclude that these guilt phase errors did not deprive Hurst of a fair trial cumulatively, we find no merit to Hurst’s cumulative error claim as to the guilt phase in this case. As to the penalty phase, we are vacating Hurst’s sentence of death and remanding for a new penalty phase proceeding, thereby obviating the need to discuss cumulative error as to the penalty phase.
 

 VI. CONCLUSION
 

 Based on the foregoing, we affirm the trial court’s order denying relief as to the guilt phase claims raised by Hurst. We reverse the trial court’s order denying relief as to his penalty phase claim of ineffective assistance of counsel in investigation and presentation of mental mitigation, vacate his sentence of death, and remand for a new penalty phase proceeding before a
 
 *1016
 
 jury, which may consider available evidence of aggravation and mitigation.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 . This Court has jurisdiction under article V, section 3(b)(1), Florida Constitution.
 

 [2]
 

 . On direct appeal, Hurst raised four claims, all of which pertained to the penalty phase of his trial: (1) that the trial court erred in finding the avoid arrest aggravator; (2) that the court failed to properly weigh mitigating circumstances; (3) that the death sentence was disproportionate; and (4) that imposition of the death sentence without notice of aggravating circumstances or jury findings on the aggravators and death eligibility violated due process and the prohibition against cruel and unusual punishment.
 
 Hurst,
 
 819 So.2d at 695.
 

 [3]
 

 . In
 
 Brady,
 
 the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.”
 
 Brady,
 
 373 U.S. at 87, 83 S.Ct. 1194. The Supreme Court later held in
 
 United States
 
 v.
 
 Agurs,
 
 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), that "the duty to disclose such evidence is applicable even though there has been no request by the accused.”
 
 Strickler v. Greene,
 
 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (citing
 
 Agurs,
 
 427 U.S. at 107, 96 S.Ct. 2392).
 

 [4]
 

 . Hurst also makes a passing reference in his brief to a
 
 Giglio
 
 claim in relation to Smith’s trial testimony.
 
 See Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (holding that the prosecutor is prohibited from knowingly presenting or failing to correct false and material evidence against the defendant). We find this claim to be without merit essentially for the same reasons that we deny the
 
 Brady
 
 claim. The trial court found the prosecutor credible when he testified that he did not tell Smith he would be charged and did not decide to charge him until later.
 

 [5]
 

 . Hurst's longtime friend Michael Williams is not to be confused with trial witness Anthony Williams, who was a cellmate of Hurst and testified against him at trial.
 

 [6]
 

 . We do not address Hurst’s additional claim that the newly discovered evidence regarding Smith would have resulted in a life sentence, because in this decision we vacate Hurst's death sentence and remand for a new penalty phase proceeding.
 

 [7]
 

 . We also note thal when Investigator Nes-mith interviewed Michael Williams directly, Williams did not report that Hurst was inno
 
 *1002
 
 cent or that some other friends participated in or committed the crimes.
 

 [8]
 

 . Additionally, Anthony Williams testified at the postconviction evidentiary hearing that Griffin was in jail with him and told him it was possible he (Griffin) would get some help on his own case if he testified against Hurst.
 

 [9]
 

 . When the postconviction motion was filed in 2003, Hurst also alleged a claim under
 
 Atkins v. Virginia,
 
 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), but has not appealed denial of that claim.
 
 Atkins
 
 held that it is unconstitutional to execute a person who is mentally retarded.
 
 Id.
 
 at 321, 122 S.Ct. 2242. In this regard, "[b]olh the statute and our rule define mental retardation as 'significantly subaverage general intellectual functioning
 
 existing concurrently with
 
 deficits in adaptive behavior and manifested during the period from conception to age 18.'”
 
 Jones v. State,
 
 966 So.2d 319, 326 (Fla.2007) (quoting § 921.137(1), Fla. Stat. (2005)).
 
 See
 
 § 921.137(1), Fla. Stat. (2008); Fla. R.Crim. P. 3.203(b) (effective Oct. 1, 2004).
 

 [10]
 

 . Arnold testified that he was experienced in trying capital cases but because he won the guilt phase portions of all the capital cases he tried, except one, he had only handled one prior penalty phase proceeding.
 

 [11]
 

 . Dr. McClain also administered the Miller Forensic Assessment of Symptoms test, the Trailmaking test, The State Trait Anger Expression Inventory-2 test, the Controlled Oral Word Association test, the Rey Complex Figure test, the Rey Auditory Verbal Learning test, and the Rey 15 Item test. She interviewed Hurst's mother and father, as well as his sister.
 

 [12]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688, 691 (Fla.1993) (holding that the trial court should conduct a hearing to allow the parties to be heard, including the defendant in person, and to allow presentation of additional evidence before sentencing).