# Supreme Court of Florida

_____

No. SC12-205
_____

**QUAWN M. FRANKLIN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC12-1635
_____

**QUAWN M. FRANKLIN,**
Petitioner,

vs.

**MICHAEL D. CREWS, etc.,**
Respondent.

[January 16, 2014]

PER CURIAM.

Quawn M. Franklin appeals an order of the circuit court denying his motion to vacate his conviction of first-degree murder and sentence of death filed under Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ of

habeas corpus.  We have jurisdiction.  See art. V, § 3(b)(1), (9), Fla. Const.  For the

reasons that follow, we affirm the trial court's denial of postconviction relief and

deny habeas relief.

## BACKGROUND

The facts of this case are set forth in Franklin's direct appeal of his first-

degree murder conviction and sentence of death:

> Quawn M. Franklin was charged with attempted armed robbery and first-degree murder in the shooting death of Jerry Lawley in Lake County in December 2001.  Lawley's murder was the third violent crime committed by Franklin in the span of two weeks.

> Franklin was sixteen years old when he was sentenced to ten years in prison for the robbery of Clarence Martin in 1993.  He was granted conditional release from prison on October 1, 2001.  On December 18, 2001, Franklin ambushed pizza delivery man John Horan in Leesburg.  Franklin bound Horan with duct tape, drove him to another location, and then shot Horan in the back, killing him.  On December 27 or 28, Franklin and codefendant thirteen-year-old Pamela McCoy committed a forced invasion of the home of Alice Johnson in Leesburg.  Franklin struck Johnson in the head with a hammer and stole her Toyota Camry.  Johnson suffered severe injuries from this attack when pieces of her skull imbedded in her brain.  Following the attack, Johnson was unable to live on her own or participate in civic and volunteer activities.

> On December 28, Franklin drove Johnson's stolen vehicle from Leesburg to St. Petersburg to visit relatives.  Franklin was accompanied by McCoy and cousins Antwanna and Adrian Butler.  Late in the evening, the Butler cousins told Franklin that they wanted to return to Lake County.  However, none of the group had money and Franklin had to borrow ten dollars from one of his relatives in order to buy gas for the return trip.  While driving back to Lake County, Franklin showed Antwanna Butler a .357 magnum revolver he had obtained from one of his relatives in St. Petersburg.  In Leesburg,

Franklin stopped at the Elberta Crate and Box Factory and asked directions from the security guard, Jerry Lawley. Franklin then took the Butler cousins to an apartment building near their home. He told Antwanna Butler that he was going to return to St. Petersburg. He also stated that he was going "to get" the security guard.

Franklin returned to the crate factory in the early morning hours of December 29, 2001. He ordered Lawley out of his vehicle at gunpoint. While Lawley was complying and on his knees in the factory parking lot, Franklin shot Lawley once in the back. In statements made by Franklin after his apprehension, he stated that he shot Lawley because he "didn't have no other choice. . . . What I did, I wanted to do it at the time." Franklin rifled Lawley's pockets and also searched Lawley's car. However, Franklin found nothing of value and was unable to get Lawley's car to move. Franklin left the scene and fled to St. Petersburg.

After being shot, Lawley sought help from a company truck driver, Edward Ellis. Ellis had arrived at the crate factory earlier in the evening, parked his truck in the lot, and gone to sleep in the truck cab. Lawley drove his car a short distance across the crate factory grounds to where Ellis's truck was parked. Lawley pounded on the cab of Ellis's truck and shouted that he had been shot. Lawley told Ellis that a tall black male wearing a knit cap had shot him. Lawley also told Ellis that the man was driving a relatively new blue car and had tried to rob him. Ellis called 911 at 5:44 a.m., and Leesburg Police Officer Joseph Iozzi responded to the scene. Lawley also told Officer Iozzi that a thin black male, approximately six feet tall and wearing a knit cap, had ordered him from his car at gunpoint, told him to lie on the ground, and then shot him in the back while he was doing as told. Lawley also told the officer that the man had left the scene in a newer model blue, four door car, possibly a Pontiac.

During the early morning hours of December 30, a St. Petersburg police officer came upon a blue 2000 Toyota Camry in which Franklin was asleep in the driver's seat and codefendant McCoy was asleep in the passenger seat. Franklin was wearing gloves, and the officer found a revolver under the driver's seat. Crime scene technicians found a spent .357 caliber shell casing and five rounds of live ammunition in the revolver. They also located a black

knit skull cap in the trunk of the car. The St. Petersburg officer took Franklin and McCoy into custody. After being informed of his rights, Franklin agreed to give a statement to the police, in which he admitted shooting Lawley. Franklin also stated that he had intended to rob Lawley, but Lawley had nothing of value he could take, that he shot Lawley because he "wanted to," and that he wore gloves so that he would not leave any fingerprints. In his statement to the St. Petersburg police, Franklin said that all of the companions who had made the original trip to St. Petersburg were in the car at the time of the shooting. However, Franklin later contradicted this statement in an interview with a reporter when he stated that only McCoy was with him during the shooting. Antwanna Butler also testified that she and her cousin had been dropped off at their home by Franklin and that they were not present during the shooting of Lawley.

While awaiting trial in the Lake County jail, Franklin contacted a newspaper reporter from the Orlando Sentinel and gave an interview in which he incriminated himself in Lawley's murder. While parts of the taped interview were redacted, the trial court overruled Franklin's objections to three other passages, which were played at trial. The objectionable portions included Franklin's statements that he had decided to confess because he was "tired of life" and "tired of being treated just like an animal"; that he saw a helicopter looking for the car he was in and that he was hiding from the helicopter; and that he had committed the crime, but that "the people, the world, life" were the cause of his actions and that he was tired of people watching him and hating him and that he hated life. Defense counsel posed a relevance objection to the statements about Franklin's motivation in confessing and objected that the statements about hiding from the helicopter could be interpreted as evidence that the car had been stolen or that the police were looking for Franklin for some other reason. Defense counsel renewed these objections at trial when the tape was introduced into evidence.

. . .

Both [Ellis and Officer Iozzi] testified [during the State's case-in-chief] that Lawley stated he had been shot by a tall, thin black man wearing a knit cap and driving a blue, four-door car; that the shooter had searched through Lawley's pockets and car; and that Lawley was in a great deal of pain and having difficulty breathing after being shot.

- 4 -

Antwanna Butler testified that Franklin showed her a big silver or chrome revolver on the trip back to Leesburg from St. Petersburg and that Franklin stated his intent to go back and "get" the security guard after dropping off Butler and her cousin in the early morning hours of December 29. The jury also heard Franklin's audiotaped confession to the police and his audiotaped interview with the newspaper reporter. On each tape, Franklin admitted that he killed Lawley and that he had intended to rob him. In the newspaper interview, Franklin also stated that he had intended to take Lawley's car, but had been unable to move it.

The State's other guilt phase witnesses included crime scene technicians, forensic experts, the medical examiner, and various law enforcement officers who either were involved in the investigation or had contact with Franklin while he was in custody. The experts testified that the bullet recovered at the crime scene contained Lawley's DNA and had been fired from the revolver found under the driver's seat of the car in which Franklin was apprehended. The experts also testified that Lawley was shot in the back while kneeling on the ground and died from the injuries inflicted by this single gunshot. The gun was fired from at least five and a half feet away from Lawley. The medical examiner testified that the bullet entered Lawley's left back below his lower rib cage, injured the lower portion of his left lung, bruised the surface of his heart, passed through his diaphragm, passed through his liver, and exited his left upper abdomen. The medical examiner also noted that both of Lawley's knees were scraped and that the exit wound was not "supported" or "shored," indicating that Lawley was not lying on the ground when shot. The jury found Franklin guilty as charged of first-degree murder and attempted armed robbery with a firearm.

During the penalty phase, the State presented a videotaped deposition by the victim of Franklin's 1993 robbery; the testimony of an officer who was at the scene of the Horan murder on December 18, 2001, and the home invasion and attack on Johnson on December 28, 2001; the testimony of Johnson recounting Franklin's attack on her; and the testimony of the officer who investigated Horan's murder. . . .

Codefendant McCoy testified that Franklin had obtained a big silver gun while in St. Petersburg; Franklin stated it was going to

"hurt a little, but it will only take a second" before he exited his vehicle and ordered Lawley to get on the ground; Lawley asked Franklin not to shoot him; and Franklin shot Lawley in the back while Lawley was kneeling on the ground with his hands behind his head.

. . .

Defense counsel had subpoenaed Minnie Thomas, the woman who raised Franklin until he was eight years old and whom he called Mom. However, Thomas was either unavailable or unwilling to testify at trial. The court permitted the defense to present Thomas's deposition in lieu of her live testimony. The parties also stipulated to other facts that Thomas would have presented about Franklin's background and family history. The other defense penalty phase witness was Franklin himself who testified about his background and child[hood]. Franklin described the trauma of being forcibly removed from the only family he knew when he was eight years old, being taken to St. Petersburg by his biological mother, and his failed attempts to return to the Thomas family in Leesburg by stealing bikes, cars, and money. Franklin also testified about his experiences in juvenile facilities from age nine, including being physically and sexually abused by older boys in the facilities, and his imprisonment in adult prison at age fifteen.

At the conclusion of the penalty phase, the jury returned a unanimous recommendation of a death sentence. The jury also unanimously agreed [through a special penalty phase verdict form] that four aggravating factors were present: (1) the murder was committed while Franklin was serving a prison sentence because he was on conditional release at the time of Lawley's shooting; (2) Franklin had previous violent felony convictions, including another capital felony for the murder of Horan; (3) Lawley's murder was committed for pecuniary gain; and (4) the murder was cold, calculated, and premeditated (CCP).

Franklin v. State, 965 So. 2d 79, 84-88 (Fla. 2007) (footnotes omitted). No additional evidence was presented at the Spencer hearing.[1] The four aggravators found by the jury were also found by the sentencing judge. Franklin, 965 So. 2d at

---

1. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

88. After considering the mitigation presented, the sentencing court found no statutory mitigators applicable, although it did find ten nonstatutory mitigating factors. Id.[2] Franklin was sentenced to death for the murder of Mr. Lawley. Id. at 88.[3] On direct appeal, we affirmed Franklin's first-degree murder conviction and death sentence. Id. at 84.[4]

---

2. The nonstatutory mitigators were as follows:

(1) there were deficiencies in Franklin's upbringing which included being forcibly removed by his biological mother from the only mother and father he had known for eight years (given some weight); (2) Franklin had been sentenced to adult prison at a young age and served eight years of a ten-year sentence, which was a severe sentence in light of his prior record (given little weight); (3) Franklin had cooperated with law enforcement after his arrest (given some weight); (4) Franklin took responsibility for his crimes by confessing to the police and a newspaper reporter (given some weight); (5) Franklin had offered to plead guilty in return for a life sentence without possibility of parole that would run consecutive to his other life sentences (given little weight); (6) Franklin apologized to the victim's family, showed remorse, and confessed to other offenses which were used as aggravating circumstances (given some weight); (7) Franklin apologized and showed remorse for his other crimes (given little weight); (8) Franklin had entered pleas in his related cases and had been sentenced to life (given some weight); (9) there was no one available to testify on Franklin's behalf in the penalty phase (given some weight); and (10) codefendant McCoy received a thirty-five-year sentence for her role in the crimes (given little weight).

Id. at 88 n.4.

3. Franklin received a life sentence for the attempted armed robbery of Mr. Lawley. Id. Franklin was also sentenced to life imprisonment after pleading guilty to the first-degree murder, kidnapping, and armed robbery of Mr. Horan. Id. at 84 n.1. During the trial involving the attack on Ms. Johnson, Franklin pled guilty to

On November 7, 2008, Franklin moved the circuit court to vacate his judgment and sentence pursuant to Florida Rule of Criminal Procedure 3.851. Franklin also moved for a competency determination. On January 20, 2010, a competency hearing was held; on June 3, 2010, the circuit court found that Franklin was competent to proceed. Thereafter, on August 2, 2010, Franklin amended the motion to vacate his judgment and sentence, raising eleven claims.[5]

_____

burglary, robbery with a deadly weapon, and attempted felony-murder, and was also sentenced to life imprisonment. Id. at 84 n.2.

> 4. Franklin raised the following eight claims on direct appeal:
>
> (1) the admission of hearsay statements relating to his prior violent felony convictions during the penalty phase violated his constitutional right to confront witnesses in light of the United States Supreme Court's recent decision in Crawford v. Washington, 541 U.S. 36 (2004); (2) the trial court erred in admitting the objected-to portions of Franklin's taped interview with the newspaper reporter; (3) the guilt phase admission of hearsay statements made by the victim also constituted a Crawford violation; (4) the trial court erred by refusing to accept Franklin's stipulation to his prior violent felony convictions in lieu of testimony regarding the crimes; (5) improper victim impact evidence was presented to the jury; (6) the CCP aggravating factor was not properly found; (7) the pecuniary gain aggravating factor was not properly found; and (8) Florida's capital sentencing statute is facially unconstitutional under Ring [v. Arizona, 536 U.S. 584 (2002)] because the judge rather than the jury determines the sentence to be imposed.

Id. at 88.

> 5. The claims were: (1) ineffective assistance of penalty phase trial counsel; (2) ineffective assistance of penalty phase trial counsel by failing to call Dr. Douglas Mason; (3) ineffective assistance of trial counsel during voir dire; (4)

On April 13, 2011, the postconviction court summarily denied claims three through eight and ten. An evidentiary hearing was conducted on claims one, two, nine, and eleven,[6] which were denied by the postconviction court on January 5, 2012. This appeal followed. On August 6, 2012, Franklin filed an accompanying petition for writ of habeas corpus with the Court, asserting two claims.

**ANALYSIS**

Franklin raises the following claims for review: (1) the postconviction court erred in finding him competent to proceed in his postconviction proceedings; (2) the postconviction court erred in denying his claim of ineffective assistance of trial counsel during the penalty phase; (3) the postconviction court erred in summarily denying his claim that trial counsel were ineffective during voir dire and for failing to file a motion for a change of venue; (4) Florida's method of execution for lethal injection is cruel and unusual punishment and would deprive him of his due

_____

ineffective assistance of trial counsel by failing to file a motion for a change of venue; (5) ineffective assistance of trial counsel in failing to inform the jury of Franklin's ineligibility for parole; (6) Florida's method of execution by lethal injection violates both the Florida and United States Constitutions; (7) Franklin is prohibited from knowing the identity of the execution team members in violation of his rights under the Florida and United States Constitutions; (8) ineffective assistance of trial counsel pertaining to Franklin's competency; (9) ineffective assistance of trial counsel by failing to investigate and present an insanity defense; (10) Franklin's right against cruel and unusual punishment will be violated because he may be incompetent at the time of execution; and (11) cumulative error deprived Franklin of a fundamentally fair trial.

6. The evidentiary hearing was conducted on July 11, 2011 and October 19, 2011.

- 9 -

process and equal protection rights under the United States Constitution (habeas claim); and (5) his right against cruel and unusual punishment under the Eighth Amendment to the United States Constitution will be violated because he may be incompetent at the time of execution (habeas claim). We address each claim in turn below.

## I. COMPETENCY TO PROCEED

Franklin claims that the postconviction court erred in finding him competent to proceed in his postconviction proceedings. In order to determine whether a defendant is competent to proceed at trial or in postconviction proceedings, the postconviction court must discern whether he "has sufficient present ability to consult with counsel with a reasonable degree of rational understanding—and whether he has a rational as well as a factual understanding of the pending collateral proceedings." Alston v. State, 894 So. 2d 46, 54 (Fla. 2004) (quoting Hardy v. State, 716 So. 2d 761, 763 (Fla. 1998)); see also § 916.12(1), Fla. Stat. (2012); Fla. R. Crim. P. 3.851(g)(8)(A), (B).

"It is the duty of the trial court to determine what weight should be given to conflicting testimony." Mason v. State, 597 So. 2d 776, 779 (Fla. 1992). "[W]hen the experts' reports or testimony conflict regarding competency to proceed, it is the trial court's responsibility to consider all the relevant evidence and resolve such factual disputes." Alston, 894 So. 2d at 54. "Where there is sufficient evidence to

support the conclusion of the lower court, [this Court] may not substitute [its] judgment for that of the trial judge." Mason, 597 So. 2d at 779. "A trial court's decision regarding competency will stand absent a showing of abuse of discretion." Alston, 894 So. 2d at 54. "[A] trial court's decision does not constitute an abuse of discretion 'unless no reasonable person would take the view adopted by the trial court.' " Id. (quoting Scott v. State, 717 So. 2d 908, 911 (Fla. 1998)). "[W]hen analyzing a competency determination on appeal, this Court applies the competent, substantial evidence standard of review to the trial court's findings." Gore v. State, 24 So. 3d 1, 10 (Fla. 2009).

At the competency hearing, Franklin offered the testimony of Dr. Glenn Caddy, a psychologist, who reviewed Franklin's records and evaluated him in November 2007 and October 2008. Dr. Caddy testified that Franklin informed him that God had a plan for him and that if God wanted Franklin to proceed in the postconviction matters, God would tell him. Franklin, who chronically read the Bible, told Dr. Caddy that he did not receive such a message from God, and thus, God did not wish for him to participate in helping his counsel. Therefore, Franklin refused to sign the verification for his 3.851 motion because doing so would signify such participation. Dr. Caddy opined that this refusal is a product of Franklin's mental illness. Dr. Caddy described this situation as conceptive thought insertion with auditory hallucinations. Dr. Caddy opined that Franklin suffers from

a specific delusional disorder related to religion, a psychotic process. Dr. Caddy opined, however, that Franklin understands the adversarial nature of the legal process in the collateral proceedings, has sufficient present ability to consult with counsel with a reasonable degree of rational understanding, and has a factual understanding of the pending collateral proceedings. According to Dr. Caddy, Franklin's rational understanding of the pending collateral proceedings is disrupted by the delusional process.

In rebutting Dr. Caddy's testimony, the State presented the testimonies of Drs. James Hogan and Ava Land, who are both psychologists. Dr. Hogan, who evaluated Franklin in 2009,[7] opined that Franklin is competent to proceed with the postconviction proceedings based on his current mental state and history of malingering. Dr. Hogan found Franklin to be preoccupied with religion, but disagreed with Dr. Caddy's opinion that Franklin suffers from a delusional system. Dr. Hogan added that Franklin was lucid.

Dr. Land, who reviewed Franklin's records and saw him three times in

---

7. In 1996, Dr. Hogan first met Franklin when he was a senior psychologist at Sumter Correctional Institution; Franklin was incarcerated there. At that time, Dr. Hogan saw signs that Franklin was malingering. In 2004, Dr. Hogan was appointed by the trial court to evaluate Franklin pretrial.

2009,[8] opined that there is no fixed delusional system operating within Franklin. According to Dr. Land, Franklin's religious beliefs are simply religious beliefs. Franklin told Dr. Land that he understands that he is scheduled to be executed by lethal injection. According to Dr. Land, Franklin has not signed the verification because he does not want to participate in anything he sees as fruitless and he made a rational decision not to "push" the postconviction proceedings.

Relying on the testimonies of Drs. Hogan and Land, the postconviction court concluded that Franklin "has the capacity to understand the adversary nature of the legal process and these collateral proceedings [and] has the ability to disclose to his lawyers facts pertinent to these postconviction proceedings." We conclude that the postconviction court did not abuse its discretion in finding Franklin competent to proceed in his postconviction proceedings. There is competent, substantial evidence supporting the postconviction court's finding. Accordingly, we deny this claim.

## II. POSTCONVICTION MOTION

### a. Ineffective Assistance of Trial Counsel

### i. Penalty Phase

---

8. Dr. Land first met Franklin in 2004 when she was asked pretrial to conduct a competency evaluation. In 2004, Dr. Land believed that Franklin was malingering his mental illness symptoms.

- 13 -

Franklin asserts that his trial counsel were ineffective in failing to adequately investigate and present mitigating evidence during the penalty phase. In denying Franklin's claim of ineffective assistance of penalty phase counsel, the postconviction court found that "[t]rial counsel conducted an extensive investigation into potential mitigating evidence" and that there was "no reasonable probability of a different result had trial counsel performed as alleged by Franklin."

For ineffective assistance of counsel claims, the defendant must prove:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

Ferrell v. State, 29 So. 3d 959, 969 (Fla. 2010) (quoting Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986) (citations omitted)). "[W]hen a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong." Preston v. State, 970 So. 2d 789, 803 (Fla. 2007) (quoting Stewart v. State, 801 So. 2d 59, 65 (Fla. 2001)). There is a strong presumption that trial counsel's performance was not ineffective. See Strickland v. Washington, 466 U.S. 668, 689 (1984). Because ineffective assistance of counsel claims present mixed questions of fact and law, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's

- 14 -

legal conclusions de novo.  See Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004).

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.  "[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000).  The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).  "It is unquestioned that under the prevailing professional norms . . . counsel ha[s] an 'obligation to conduct a thorough investigation of the defendant's background.' " Porter v. McCollum, 558 U.S. 30, 39 (2009) (quoting Williams v. Taylor, 529 U.S. 362, 396 (2000)).  Moreover, trial counsel must not ignore pertinent avenues for investigation of which he or she should have been aware. See Porter, 558 U.S. at 40.  "[I]t is axiomatic that 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular

investigations unnecessary.' " Hurst v. State, 18 So. 3d 975, 1008 (Fla. 2009) (quoting Strickland, 466 U.S. at 691).

We first address Franklin's assertion that trial counsel failed to present live testimony at trial other than Franklin himself. We find that trial counsel for Franklin should not be faulted for the absence of Mrs. Thomas' testimony at the penalty phase.[9] In lieu of Mrs. Thomas' live testimony, the defense was allowed to read portions of her deposition to the jury and the parties stipulated to additional facts to which Mrs. Thomas would have testified.

Franklin claims that his trial counsel were deficient in failing to speak with his family members residing in St. Petersburg. However, Franklin's trial counsel testified at the evidentiary hearing that Franklin made it very clear that he did not want his attorneys to have any contact with his family in St. Petersburg, and in fact threatened not to attend his own trial.[10] We conclude that trial counsel were not deficient in this regard. See Rodriguez v. State, 919 So. 2d 1252, 1263 (Fla. 2005) (quoting Strickland, 466 U.S. at 691) ("The reasonableness of counsel's actions

---

9. We note that the defense subpoenaed Mrs. Thomas. Franklin, 965 So. 2d at 87.

10. We note that Katina Shorter, Franklin's cousin, agreed at the evidentiary hearing that after Franklin was incarcerated for the instant crimes he indicated that he did not want anything more to do with his family.

- 16 -

may be determined or substantially influenced by the defendant's own statements or actions.").[11]

Franklin asserts that trial counsel failed to obtain numerous records, including his school records, and a 1993 predisposition report and a presentencing investigation report relating to a grand theft. Franklin maintains that a proper investigation would have provided trial counsel with "a range of mitigation leads that no other source had opened up:" that his mother was very ill, could not care for him, and tried to get him back at the age of three months, but Mrs. Thomas would not return him to her; Mrs. Thomas forged Franklin's last name to "Thomas," leading Franklin to believe that he was her child; Franklin's mother acquired custody of Franklin when he was seven years old; Franklin's mother was upset because Mrs. Thomas continuously attempted to be involved in Franklin's life, was a bad influence, and undermined her authority and encouraged Franklin to run away; there was no father figure in Franklin's home; Todd, Franklin's brother, was in prison; and Franklin had hearing deficits. Franklin also asserts that trial counsel failed to present evidence that he suffers from a delusional disorder which led to hallucinations.

---

11. To the extent Franklin contends that his trial counsel were deficient for failing to employ a mitigation expert, we reject this claim. See Johnson v. State, 104 So. 3d 1010, 1025 (Fla. 2012).

- 17 -

The record reflects that the penalty phase jury heard that Franklin's mother was unable to take care of Franklin, that Franklin's mother took Franklin back when he was eight years old, that Franklin thought that his last name was "Thomas," and he called Mr. and Mrs. Thomas "mom" and "dad." This Court has "repeatedly held that counsel is not ineffective for failing to present cumulative evidence." Jones v. State, 998 So. 2d 573, 586 (Fla. 2008). Franklin argues that trial counsel were deficient in failing to present evidence of trauma and loss during Franklin's childhood and adolescence. We note, however, that during his penalty phase testimony, Franklin described the situation of being taken by his mother at eight years old.

Franklin also asserts that trial counsel failed to obtain comprehensive psychological and psychiatric evaluations and trial counsels' decision not to present mental health mitigation was not supported by a reasonable investigation and did not reflect reasonable judgment. Trial counsel testified at the evidentiary hearing that he and co-counsel discussed at length the wisdom of calling any psychological expert and none of the experts who saw Franklin were able to provide any mental mitigation which outweighed the negative information. Trial counsel testified that the defense obtained at least some mental health records from the Florida Department of Corrections, which indicated that Franklin was manipulative and has antisocial personality disorder. Trial counsel had the

understanding, before trial, that Franklin was treated in prison with various antipsychotic medications for various conditions/mental disorders.[12]

Franklin additionally claims that the postconviction court erred in denying his claim that trial counsel were ineffective for failing to have Dr. Douglas Mason, a neuropsychologist, testify during the penalty phase. The postconviction court found that trial counsel made a strategic decision in not presenting the testimony of Dr. Mason during the penalty phase. The record reveals that Dr. Mason evaluated Franklin on January 26, 2004, before trial commenced. On April 2, 2004, the defense filed a notice of intent to present expert testimony from Dr. Mason to establish the following mental mitigation:

> (1) The Defendant has a severe mental disturbance; (2) The Defendant has deficits in attention, speed of mental processing, judgment, planning, cognitive flexibility, and inhibitory control; (3) The Defendant is impaired in his processing of sensory information; (4) The Defendant exhibits symptoms consistent with deficits in the brain that result[s] in impulsive behaviors, limited judgment and difficulty with behavioral regulation; (5) The Defendant has limited ego strength and bizarre mentation; (6) The Defendant is suffering from a psychotic process; [and] (7) Defendant has bipolar I disorder, severe without psychotic features; dysthymic disorder, schizophrenia undifferentiated type; and antisocial personality disorder.

On April 14, 2004, Dr. Mason was then deposed, wherein he said that he could not make a definitive statement as to Franklin's mental state at the time of

---

12. Trial counsel sought to obtain Franklin's school records from the Lake County School Board, which did not have any records for Franklin. Trial counsel testified that the defense possessed school records from Pinellas County.

the murder. Dr. Mason also acknowledged that Franklin was diagnosed as a malinger and tended to embellish and contradict himself. Further, Dr. Mason concurred with an antisocial personality diagnosis and maintained that Franklin is "somebody that does lack a consci[ence]."

At the evidentiary hearing, trial counsel believed that the decision not to call Dr. Mason was due to statements Dr. Mason made in his deposition. According to trial counsel, Dr. Mason's statement that Franklin had no conscience was inconsistent with the defense's efforts to humanize and portray Franklin as being remorseful. In trial counsel's professional opinion, the calling of Dr. Mason would have been worse for Franklin than not calling him.

Even assuming counsel was deficient in some aspect of the handling of the mitigation portion of the proceeding, we nonetheless conclude that ineffective assistance has not been demonstrated because the prejudice prong of Strickland has not been demonstrated. "Penalty phase prejudice under the Strickland standard is measured by whether the error of trial counsel undermines this Court's confidence in the sentence of death when viewed in the context of the penalty phase evidence and the mitigators and aggravators found by the trial court." Hurst, 18 So. 3d at 1013. This standard does not "require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine

confidence in [that] outcome.' " Porter, 558 U.S. at 44 (quoting Strickland, 466 U.S. at 693-94). "To assess that probability, [the Court] consider[s] 'the totality of the available mitigation evidence . . .' and 'reweig[hs] it against the evidence in aggravation.' " Porter, 558 U.S. at 41 (quoting Williams, 529 U.S. at 397-98).

In this case, the jury unanimously recommended a death sentence at the conclusion of the penalty phase. Both the jury and the sentencing judge found applicable the following four aggravating circumstances: (1) the murder was committed while Franklin was serving a prison sentence (conditional release); (2) Franklin had previous violent felony convictions, including capital murder; (3) the murder was committed for pecuniary gain; and (4) CCP. Franklin, 965 So. 2d at 87-88. The sentencing court did not find any statutory mitigators although it did find ten nonstatutory mitigators.[13]

At the penalty phase, Franklin presented testimony that when he was six weeks old his mother placed him to live with Mrs. Thomas and her husband, who he called "mom" and "dad." Franklin's mother removed Franklin from the Thomas household when he was eight years old, although Franklin did not want to leave. Franklin did not see Mrs. Thomas again until he was fifteen years old, after he was stabbed in his liver. Franklin testified that from the age of nine he stole bicycles so that he could return to Leesburg—where the Thomases resided.

_____

13. See supra, at note 2.

- 21 -

Franklin testified that at twelve years old, while living in a group treatment home, he was beaten up and forced to perform sexual acts. Franklin further stated that he has been incarcerated since the age of fifteen years old, except for three months in 2001. Franklin, who confessed to the police, offered his apologies to Ms. Johnson and to the families of Mr. Horan and Mr. Lawley in court.

At the evidentiary hearing below, Franklin offered the testimony of Dr. Caddy, who testified that Franklin is mentally ill with a psychotic process operating within him and that he suffers from hallucinations, a delusional disorder, concentration and attention deficits, limitations to his neural circuitry, and functions at a very low level.[14] Dr. Caddy opined that at the time of the murder, Franklin perceived that there were elements of control and elements of dyscontrol and recognized that he created delusions and images, which played a "massive" role in a lot of what he did; Franklin was largely disconnected from emotion. Dr. Caddy observed that Franklin consumed alcohol and marijuana in at least the weeks leading up to the murder. Dr. Caddy noted that Franklin was born with a bilateral hearing deficit, which improved after undergoing surgeries in the early 1990's. Dr. Caddy acknowledged that Franklin met the criteria for antisocial personality disorder. The State's expert, Dr. Elizabeth McMahon, testified that

---

14. Dr. Caddy testified that he was unable to formally diagnose Franklin, who did not allow Dr. Caddy to conduct any neuropsychological and psychoeducational testing.

there was no indication that Franklin was suffering from a psychosis or from problems perceiving reality.

Franklin also presented postconviction testimony that his mother ingested epilepsy medication while pregnant with him, that Mrs. Thomas was a bad influence, and that he had no father figure after his removal from the Thomas home. Family members testified that Franklin heard voices, including a devil, who told him to do things. Marjorie Hammock, an expert in clinical social work and biopsychosocial assessments, testified that as a child, Franklin had significant challenges in terms of consistency and development, was emotionally disturbed and handicapped, and suffered from educational and cognitive learning deficits, behavioral problems, and received poor grades. Additionally, Ms. Hammock testified that it was very hard for Franklin to develop a sense of self, and he was unable to meet his own needs, make good decisions, think consciously, feel safe, and have positive relationships.

In considering the totality of available mitigation—including the minimal, additional information presented at the evidentiary hearing—when reweighed against the weighty aggravation in this case, it cannot be said that confidence in the outcome of the penalty proceeding is undermined. Therefore, we do not find that any alleged deficient performance resulted in prejudice which meets the prejudice prong of the Strickland analysis. We therefore affirm the postconviction court's

denial of Franklin's claim of ineffective assistance of penalty phase counsel on that basis.

## ii. Voir Dire

Franklin next contends that the postconviction court erred in summarily denying his claim that his trial counsel were ineffective during voir dire. "[A] defendant is entitled to an evidentiary hearing on a postconviction relief motion unless (1) the motion, files, and records in the case conclusively show that the prisoner is entitled to no relief, or (2) the motion or a particular claim is legally insufficient." Hamilton v. State, 875 So. 2d 586, 591 (Fla. 2004) (quoting Freeman v. State, 761 So. 2d 1055, 1061 (Fla. 2000)). In LeCroy v. Dugger, 727 So. 2d 236 (Fla. 1998), this Court stated:

> A motion for postconviction relief can be denied without an evidentiary hearing when the motion and the record conclusively demonstrate that the movant is entitled to no relief. A defendant may not simply file a motion for postconviction relief containing conclusory allegations that his or her trial counsel was ineffective and then expect to receive an evidentiary hearing. The defendant must allege specific facts that, when considering the totality of the circumstances, are not conclusively rebutted by the record and that demonstrate a deficiency on the part of counsel which is detrimental to the defendant.

Id. at 239 (quoting Kennedy v. State, 547 So. 2d 912, 913 (Fla. 1989)).

Relying on United States v. Cronic, 466 U.S. 648 (1984), Franklin asserts that he was functionally devoid of counsel during a critical stage of trial, jury

selection, and denied an adversarial testing of the State's case. We have previously explained the decision in Cronic:

> [T]he "Supreme Court created an exception to the Strickland standard for ineffective assistance of counsel, and acknowledged that certain circumstances are so egregiously prejudicial that ineffective assistance of counsel will be presumed." These circumstances include those where the accused is denied the presence of counsel at a critical stage in the proceeding, where counsel entirely fails to subject the State's case to a meaningful adversarial testing, and where the circumstances are such that even competent counsel could not render assistance.

Fennie v. State, 855 So. 2d 597, 602 (Fla. 2003) (quoting Stano v. Dugger, 921 F.2d 1125, 1152 (11th Cir. 1991)).

In rejecting this claim, the postconviction court found that Franklin was not functionally devoid of counsel during voir dire and he could not show that he was actually prejudiced by trial counsels' performance. We agree. After thoroughly reviewing the record, Franklin's trial counsel "did not stand mute during the jury selection process or otherwise completely fail to test the impartiality of jurors on important matters." Id. We conclude that the postconviction court did not err in summarily denying Franklin's claim that trial counsel were ineffective during voir dire.

**iii. Change of Venue**

Franklin also argues that the postconviction court erred in summarily denying his claim that his trial counsel were ineffective in failing to file a motion for a change of venue. Franklin maintains that Lake County, where he was tried,

was saturated with prejudicial and inflammatory pretrial media attention. The postconviction court disagreed:

> [H]ad counsel for the defendant filed a motion for change of venue there is very little probability this court would have granted same.
>
> As most know pretrial publicity is normal and expected in certain types of cases and that fact by itself will not require a change of venue.
>
> The record clearly shows that a limited number of prospective jurors had knowledge of the case. The jurors were asked about their knowledge of the case after being informed of a few of the facts; only a small number indicated that they had some knowledge.
>
> The court conducted individual voir dire of the eleven (11) jurors who indicated they had knowledge; of these eleven (11) jurors four (4) were excused for cause. A simple review of the record of the voir dire establishes no valid basis for trial counsel in good faith to raise a motion for a change of venue. It should be noted, the majority of the prospective jurors were unaware of the defendant's crimes. Typically, absent an extreme case, the need to change venue should not be determined until an attempt is made to select a jury. In this case it is obvious that there was no good faith reason for trial counsel to move for a change of venue.
>
> Just because there is intense media coverage does not prove that anyone cared to read about it, listen to it, view it or cared one [whit] about the coverage. As the jury selection in this case bears out, most of the prospective jurors knew nothing about this case or the other crimes involving this defendant; this is precisely why an attempt to obtain a jury should be made prior to moving to change venue unless some extraordinary circumstances exist.
>
> Accordingly, the court finds that the defendant [cannot] establish prejudice due to trial counsel's failure to move for change of venue[.]

For the prejudice prong of this claim, Franklin "must, at a minimum, 'bring forth evidence demonstrating that the trial court would have, or at least should have, granted a motion for change of venue if [defense] counsel had presented such a motion to the court.' " Dillbeck v. State, 964 So. 2d 95, 104 (Fla. 2007) (quoting Wike v. State, 813 So. 2d 12, 18 (Fla. 2002)).  The standard for a change of venue is as follows:

> Knowledge of the incident because of its notoriety is not, in and of itself, grounds for a change of venue.  The test for determining a change of venue is whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely upon the evidence presented in the courtroom.

McCaskill v. State, 344 So. 2d 1276, 1278 (Fla. 1977) (quoting Kelley v. State, 212 So. 2d 27, 28 (Fla. 2d DCA 1968)).  In ruling on a motion for a change of venue, the trial court should consider:  "(1) the extent and nature of any pretrial publicity; and (2) the difficulty encountered in actually selecting a jury." Rolling v. State, 695 So. 2d 278, 285 (Fla. 1997).

We find that Franklin has "failed to demonstrate a legal basis for filing a motion for change of venue," and "there were no undue difficulties in selecting an impartial jury." Dillbeck, 964 So. 2d at 104.  We reject Franklin's assertion that Lake County was saturated with prejudicial and inflammatory pretrial media attention.  In fact, out of the fifty-six venire members questioned, only eleven

individuals had been exposed to pertinent news coverage. Because there was no legal basis for a change of venue, we find that Franklin's trial counsel were not ineffective for failing to so move. Accordingly, we conclude that the postconviction court did not err in summarily denying this claim.

### III. HABEAS PETITION

### a. Lethal Injection Claim

In his first claim set forth in his petition for a writ of habeas corpus, Franklin argues that Florida's lethal injection method of execution is cruel and unusual punishment and would deprive him of his due process and equal protection rights secured under the United States Constitution. Franklin's only factual allegation supporting his claim is a reference to the execution of Florida inmate Angel Diaz in December 2006. In Lightbourne v. McCollum, 969 So. 2d 326 (Fla. 2007), this Court discussed the facts surrounding the Diaz execution and upheld Florida's revised lethal injection protocol against an Eighth Amendment challenge. Moreover, in Ventura v. State, 2 So. 3d 194 (Fla. 2009), we held that Florida's lethal injection protocol survived constitutional scrutiny under each of the Eighth Amendment standards articulated by the United States Supreme Court in Baze v. Rees, 553 U.S. 35 (2008). See also Muhammad v. State, 38 Fla. L. Weekly S919 (Fla. Dec. 19, 2013), cert. denied, 2014 WL 37226 (2014); Pardo v. State, 108 So.

3d 558 (Fla.), cert. denied, 133 S. Ct. 815 (2012); Valle v. State, 70 So. 3d 530 (Fla.), cert. denied, 132 S. Ct. 1 (2011).

Because we have previously rejected similar lethal injection challenges and Franklin has not cited any new evidence or otherwise made any additional allegations that would call into question the State's current method of execution, we deny Franklin's claim. See Rigterink v. State, 66 So. 3d 866, 898 (Fla. 2011) ("Rigterink neither relies on any new evidence concerning the substances injected or its injection procedures, nor does he advance any claims under the United States Supreme Court's decision in Baze.").

### b. Incompetence at the Time of Execution

Franklin's second and final claim raised in his habeas petition is that his right against cruel and unusual punishment will be violated because he may be incompetent at the time of execution. We conclude that Franklin is not entitled to relief. See Valentine v. State, 98 So. 3d 44, 58 (Fla. 2012) (rejecting the claim that the defendant may not be competent at the time of execution where defendant acknowledges that the claim is not ripe for review since a death warrant was not issued and was being raised only for preservation purposes).

### CONCLUSION

For the reasons expressed above, we affirm the trial court's denial of postconviction relief and we deny Franklin's petition for habeas corpus relief.

It is so ordered.

POLSTON, C.J., and PARIENTE, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.
LEWIS, J., concurs in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

<u>Two Cases:</u>

An Appeal from the Circuit Court in and for Lake County,
     Mark Jay Hill, Judge - Case No. 2002-CF-217-A-02
And an Original Proceeding – Habeas Corpus

Mark S. Gruber and Maria Perinetti, Capital Collateral Regional Counsel – Middle Region, Tampa, Florida,

    for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, and Stephen D. Ake, Assistant Attorney General, Tampa, Florida,

    for Appellee/Respondent